**The People of the State of Illinois, Plaintiff-Appellee, v. Sherman Bickham, Defendant-Appellant.**

**Gen. No. 51,062.**

First District, Fourth Division.

February 7, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Norman W. Fishman and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and David B. Selig, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

Sherman Bickham (hereafter referred to as defendant) was indicted for the crimes of rape and taking indecent liberties with a child. He was tried before a jury which returned a verdict finding him guilty of indecent liberties, and the court sentenced him to a term of 14 to 20 years in the Illinois State Penitentiary.

Mildred Bland, mother of Doris Sullivan, the complaining witness, testified that she lived in a three and a half room apartment on the second floor, with her two daughters, Doris and Cynthia Sullivan, and a girl named Mary-Joe; that the girls slept in the living room. She further testified that she was engaged to the defendant; that he did not live with her but spent most of his time at her apartment, and had purchased a record player and kitchen and bedroom furniture for the apartment. She stated that she had frequent sexual relations with the defendant, specifically twice on the morning of June 18, 1965. She further testified that at the time of the trial her daughter Cynthia was in the Geneva home for girls.

Mildred Bland first testified as a witness for the State; she was then called as a witness for the defendant and testified that the complaining witness had told her she hated the defendant and would do anything to put him away. The witness stated that Doris hated the defendant because he tried to run the teenagers out of the house late at night, as the witness wished him to do; that she would still marry him if she could because what her daughter had said was not true. She admitted that her signature was on the complaint, but that she did not know what she was signing. She further testified that she had had the defendant arrested in March; that he was fined $100 and sent to County Jail.

When Mildred Bland was called by the State as a witness in rebuttal she testified that her testimony the day be-

467

fore, concerning her daughter's wanting to put the defendant away, was not true, and she now wished to change her testimony; that the defendant used to beat her up and she was afraid of him; that when she was on the witness stand the day before she was trying to help the defendant, but that she did not want anything more to do with him.

Doris Sullivan, the complaining witness, testified that she was 15 years old; that the defendant had been living at her home with her mother for about five or six months; that on Friday, June 18, 1965, she went to bed in the living room at about 10:30 p. m., at which time the defendant and his nephew, David Burton, were in the bedroom. She stated that she was awakened by the slamming of a door and she then put on her shoes and pajamas and started to a neighbor's apartment on the same floor; that the defendant then came out of the bedroom, asked where she was going and where her mother was; that when she told him she didn't know where her mother was, he pulled her into the bedroom; that she tried to get away from him but he threw her on the bed and got on top of her; that he put his hands around her throat and started choking her, saying he was going to kill her and would kill her mother, too; that he said, "I'll kill all of you."

The witness further testified that the defendant continued holding her and choking her; that he pulled down her pajamas and had intercourse with her; that he then told her to go to the bathroom, and when she tried to get away he dragged her back into the bedroom and again had sexual intercourse with her. She testified that the defendant said he was going to kill her and her mother when the mother got home, then said he was sorry, that he didn't mean it, and that he was sick. She testified that she finally got into the living room where she wrote a note, "Call the police. Quiet. 208," and dropped it out the window; that she saw a man pick it up and give it to an

468

officer in a squadrol which came along at that time; that the officer then came to the door of the apartment and flashed a light, at which time she pointed to the defendant and said he had raped her. She then ran to the neighbor's apartment and from there she was taken to a hospital and was examined by a doctor.

On cross-examination Doris Sullivan stated she was in the first year of high school; that the first time she had sexual relations was when she was seven years old, but that since that time she had no sexual relations until the occurrence in question. She stated that she did quarrel with the defendant about her sister Cynthia who was then in Geneva; that she was angry with him because he was "messing with" her sister. She testified that David Burton came to the house the evening of June 18, at about 10 o'clock; that the defendant was already there, and some of her friends were there also. She said she knew where her mother had gone but did not tell the defendant because she knew her mother would not want him to know.

Dr. Rafael Ortez testified that he was a senior resident in obstetrics and gynecology at Billings Hospital and was a licensed physician; that on June 19, 1965, at about 6:30 a. m., he examined Doris Sullivan; that a vaginal secretion taken from her indicated the presence of sperm and there were physicial conditions observed which could have been the result of an act of intercourse.

Officer John Cross testified that he was riding in his squadrol, going east on 63rd Street, when a man approached him and handed him a note; that after reading it he proceeded to the apartment indicated in the note, and the door was opened by the complaining witness, who appeared to be cowering and scared; that she pointed to the defendant and said, "That man raped me." The witness stated that the defendant was wearing shorts at that time; that he ordered the defendant to get dressed and

took him into custody; that he took the defendant and Doris Sullivan to the police station, then took the girl to the hospital.

The defendant, in his own behalf, testified that he was 32 years old, and was temporarily living with Mildred Bland, to whom he was engaged; that on June 18, 1965, at 9:00 a. m., he was with Mildred Bland on the street when he saw his nephew, David Burton; that about 7:30 or 8:00 that evening he and David went to the Bland home where there were four teenagers talking in the apartment; that he and David went into the bedroom and played records; that he went into the living room about 1:00 a. m., and saw the teenagers drinking wine, and he told them they should leave as it was getting late and Doris' mother would not want them there. He testified that Doris started arguing with him, then said they would leave soon, and he went back to his room with David and went to sleep; that later he was awakened by the flashlight of the policeman. He denied touching the complaining witness or having sexual intercourse with her.

The parties stipulated that if Officer John Downey were called to testify he would state that the complaining witness told him the defendant came into her bedroom and that she wrote the note and dropped it out the window, asking for help. It was further stipulated that Paul Esling, if called, would testify that he is an official court reporter assigned to the State's Attorney's office, and that on June 28, 1965, he was assigned to the Grand Jury, at which time and place the complaining witness testified with regard to the defendant that "He grabbed me by the neck and took me in the bedroom. He started choking me, and he twisted my arm behind my back. And he took my pajamas and he tore the top off. And he pulled the other part down and he told me to be quiet and shut up or he would kill me."

■ The defendant contends in this court that he did not receive a fair and impartial trial and that he was not proved guilty beyond a reasonable doubt. He first argues that during the cross-examination of the complaining witness by counsel for the defendant, the court interrupted counsel and said, "Mr. Malek, I am very liberal in this cross-examination; but you have cross-examined for fifty minutes now. And I would like you to get down to the issues." Defendant argues that since this statement was made in the presence of the jury it could have the effect of negating the testimony which had been brought out by defense counsel during the cross-examination. A reading of the cross-examination of defendant's counsel as set out in the abstract affords sufficient justification for the court's statement; the testimony was repetitious.

The defendant cites People v. Pelletri, 323 Ill 176, 153 NE 591, where the court held that the trial court has the right to hold the cross-examination within reasonable and proper limits, but it cannot substantially deny cross-examination by unduly limiting it. Also cited is People v. Coli, 2 Ill2d 186, 117 NE2d 777, which is not in point because it is an issue of identification, and it was held that under those circumstances the cross-examiner should be given wide latitude.

In People v. Smith, 63 Ill App2d 369, 211 NE2d 456, in response to a question of defense counsel, the court said it could comment on the evidence and thought it not material to the case; and when defense counsel was cross-examining a witness relative to the physical characteristics of an alley, it was said, "This is absolutely immaterial in this case, . . . Why spend time on this monkey business." Again the court overruled an objection of defense counsel and had a discussion concerning the ruling; the court said, "Do I have to be any more specific with you, . . .?" The court held at page 377, that "while the trial judge must be cautious to conceal his impressions or feel-

ings, he must conduct the trial so that it proceeds with reasonable dispatch and at the same time maintain the dignity and order of the courtroom. Both the State and the defendant must be given a full and complete opportunity to present their respective cases in full. Such requirements are difficult of attainment, and particularly so if the trial judge permits himself to be sidetracked or led astray by the provocation of counsel. It would be a dangerous precedent to permit counsel to take advantage of statements of the trial court which were either invited or provoked by such counsel . . . We do not believe that the court's comments were such as to convey to the jury a feeling of hostility or prejudice toward the defendant and thereby deny to him a fair trial, . . ."

In People v. Gilbert, 12 Ill2d 410, 147 NE2d 44, the court said, at page 415:

> "The court was well within its discretion in restricting such cross-examination. A cause will not be reversed for alleged improper rulings in that respect unless such discretion has been clearly abused. (People v. Jones, 343 Ill 291.) The ruling was neither improper nor an abuse of discretion."

In the instant case we make the same holding.

The defendant then argues that he was prejudiced before the jury and urges that the court improperly questioned David Burton, a witness for the defendant. While David was testifying on cross-examination, the following occurred:

"Q. Did you take a nap there until 2:30?
"A. I just continued playing records.
"The Court: You were playing the records in the same room?
"A. Yes, sir. That's where the record player is.

472

"The Court: And your uncle was sleeping, and you were playing records in the same room?

"A. Yes, sir."

Thereupon defendant moved for a motion for mistrial, which the court denied. Counsel for defendant stated to the court: "It's apparent that the Court has taken little credence in this witness' testimony by that question." The court stated that it could not understand the questioning and did not know whether the witness meant he was playing records in the bedroom or the living room.

█ It has been held that the court may ask questions of a witness in the trial of the case. People v. Mosley, 23 Ill2d 211, 177 NE2d 851. In People v. Green, 17 Ill2d 35, 160 NE2d 814, the court held that the propriety of judicial examination is to be determined by the circumstances of each case and the trial judge, as a seeker for truth, may be entirely justified in making pertinent inquiries. See People v. Hopkins, 29 Ill2d 260, 194 NE2d 213.

█ The defendant argues that the questions indicated that the court did not believe the testimony of the witness in the instant case, and that that impression was thereby conveyed to the jury. The court explained that the question was asked to determine where the records were being played. That is understandable, since the defendant testified that on June 18, at about 7:00 p. m., he and his nephew David went to the apartment where the complaining witness lived; that when he arrived there were four people in the apartment. He stated: "When I arrived there with David at 7:00, we goes in the living room and plays some records. Then we set and talked and listened to records." The defendant also testified that when he came to the apartment he and David went to his room and played some records. We have to take into consideration the fact that there was also testimony that records were

played at the home of David Burton. In our opinion, the question of the court was an attempt to determine where the records were played, and did not give the jury the impression of the court's disbelief in the testimony of the witness. The question was not reversible error.

The defendant relies on People v. DeLordo, 350 Ill 148, 182 NE 726. In that case the quoted record indicates (and the Supreme Court so found) that the trial judge continually made comments on the evidence, interrupted the examination of witnesses, and questioned witnesses in such manner as to disclose his opinion as to the weight or credibility of their testimony, and further, commented on the failure of defendant to produce evidence. The facts stated in that case are not at all similar to the situation before us.

The defendant also argues in this court that he was prejudiced because during the direct examination of the State's witness the State handed over police reports and Grand Jury testimony to defense counsel. At the conclusion of the direct examination of the complaining witness, the State asked that a certain paper be marked Plaintiff's Exhibit 6 for identification, then stated for the record: ". . . People's Exhibit number six for identification is a five-page typewritten document consisting of the testimony of this witness before the Cook County Grand Jury . . . And as the Defense has demanded a copy of this in writing, we now turn over People's Exhibit number six for identification." Mr. Malek [attorney for defendant] said, "Acknowledge receipt of the same. Thank you, Mr. Nellis." The State then asked to have the reporter mark People's Exhibit #7 for identification. The court interrupted and said that Mr. Malek had stepped out, and when he returned the court said, "Mr. Malek, would you ask the sheriff to get you water the next time so that you don't have to leave the court room?" Mr. Malek said, "I knew what Mr. Nellis was going to do."

Mr. Malek added, "I'm sorry, Your Honor." The Assistant State's Attorney stated that People's Exhibit #7 for identification consists of five typewritten pages containing in part statement of the complaining witness to the Chicago Police Department. The exhibit was then turned over to Mr. Malek, who acknowledged receipt of it.

In his argument in this court the defendant takes the view that defense counsel had walked out of court so he would not be placed in the position of having to accept the documents. In support of their contention the defense cites People v. Beard, 67 Ill App2d 83, 214 NE2d 577, in which case the State's Attorney had turned over the requested statement in the presence of the jury and further offered to stipulate as to the contents of the statement, and in his argument to the jury referred to the statement and to the fact that he had given it to defense counsel. At that time defense counsel objected and asked for a mistrial. The State's Attorney further argued about the consistency of the police statements with the statements of the witness on the stand. The court pointed out that at three points in the trial the defense, out of the presence of the jury, requested the People to deliver over any statements which the State's witness may have given to the State's Attorney or to the police prior to the trial. Each time the court told the defense that such request had to be made in the presence of the jury, and overruled defendant's objections to such procedure. The court held that such conduct on the part of the trial court was error.

It differs greatly from the instant case where the defendant received with thanks one of the statements. No reference to it was made in the argument and there was no objection made at the time by counsel for defendant. The giving of the document by the State's Attorney to the defendant in the presence of the jury, under the circumstances, was not reversible error. However, where

the defendant, prior to the trial, requests that the State supply him with certain documents relating to the case which are in the State's possession, the documents should not be presented to the defendant or his attorney in the presence of the jury. The proper procedure is for the Assistant State's Attorney to ask for a recess and then turn over the documents out of the presence of the jury.

 The defendant further argues that he was not proved guilty beyond a reasonable doubt and that the complaining witness' testimony is not corroborated. This latter is not entirely in accord with the facts. It could be considered that the fact of the complaining witness throwing the note out the window and the consequent arrival of the police promptly on the scene was corroboration, together with the facts disclosed in the medical examination. It has been held repeatedly that the credibility of witnesses is a matter to be determined by the trier of the facts. In the case before us, the defendant stated in his direct examination that on September 18, 1960, in the Criminal Court of Cook County, he had been convicted of rape and had been in the penitentiary until October 1963. That testimony was a matter which the jury was entitled to consider in determining the credibility of the testimony of the defendant with reference to what happened at the time in question.

The judgment of the Circuit Court is affirmed.

Affirmed.

ENGLISH and DRUCKER, JJ., concur.