(No. 21444.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ANTHONY DELORDO *et al.* Plaintiffs in Error.

*Opinion filed October 22, 1932.*

FRANK J. TYRRELL, (JOHN M. LONERGAN, of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiffs in error, Anthony DeLordo and Leslie Kidd, (herein called defendants,) were in the criminal court of Cook county indicted, tried and convicted of the crime of robbery while armed with a dangerous weapon, to-wit, a pistol. Their motions for new trial and in arrest of judgment were overruled and they were sentenced to imprisonment in the penitentiary for an indefinite term of from one year to life. They sued out of this court a writ of error for a review of the record and at the June term, 1932, submitted the cause on briefs and arguments.

The evidence for the People is to the effect that two men armed with loaded pistols entered the office of Sidney Wanzer & Sons, located on the second floor of the building at 130 West Garfield boulevard, in the city of Chicago, at about 10:30 on the morning of Sunday, June 9, 1929, and robbed Walter A. Tucker, the cashier and book-keeper of that firm, of $230, the property of said firm. Tucker and Herbert Bergfelt, employees of Sidney Wanzer & Sons, who

saw the robbery committed, identified both of the defendants at the trial as the robbers. They testified that the defendants wore gray suits when they committed the robbery, and gray caps, the visors of which were split and which were pulled down over the upper part of their faces so that their noses were the only part of their faces that could be seen. Another witness for the People, Herman Meyers, a milk salesman of Sidney Wanzer & Sons, testified that he saw the robbery committed, and that the defendant Kidd was one of the robbers and that he knew at that time that he was one of them, and that both of them had pistols in their hands. He further testified that he did not know for sure whether or not the defendant DeLordo was one of the robbers. On cross-examination he stated that he did not tell the police officers at the police station that Kidd was one of the robbers, and at that time did not remember that he knew Kidd. He further stated in his evidence, "I do not know the defendant Leslie Kidd."

The evidence of the three witnesses aforesaid is, in substance, that at the time and place of the robbery there were six or more employees in the office of the firm; that after one of the robbers, DeLordo, had taken the money in the custody of Tucker at the cashier's cage, the robbers asked Tucker to open the safe which was in the office; that he told them that he did not know the combination to the safe and could not open it, and that they then immediately started to leave the office through the hall and through the front door. Shots were fired in the hallway leading to the front door, and the robbers ran back into the office, where more shots were fired by the robbers and a policeman. When the robbers returned to the office from the hall they had the visors of their caps pulled up and the entire face of each robber was visible to the six or more employees, who were then lying on the floor to escape the bullets that were flying over them and which were coming from the revolvers of the robbers and Kelly, the police officer. Im-

mediately after the firing ceased the robbers ran into another room adjoining the office and then ran out of the building. The employees, including the witnesses aforesaid, were all lying down on the floor, and most of them were under the tables in the office room during the time the robbers and the police officer were firing their pistols.

Police officer James Kelly testified that he had heard the alarm given that the robbery in question was taking place; that he was on his way to the building, and that as he entered the door the two robbers were trying to make their escape through that door; that they fired at him and he fired at them, and that seven or more shots were fired by the robbers; that he got a good look at Kidd; that his cap was not at that time pulled down over his face; that prior to that day he had never seen Kidd; that he (the officer) was dressed in a blue uniform; that he did not get a good view of the other robber and could not identify the other defendant as one of the robbers, but he did testify that he was able to identify Kidd as one of the robbers whom he met that day and who fired shots at him.

It was stipulated on the trial that DeLordo was of the age of twenty-three years and that Kidd was of the age of twenty-two years.

The defendants testified in their own behalf and stated that they did not commit the robbery in question and that they were not in the neighborhood where it was committed, on the day it occurred. Each defendant by his evidence accounted for his whereabouts during the whole of the day on which the robbery was committed and in a manner entirely inconsistent with the People's contention that the defendants were the guilty parties.

We have not deemed it necessary to set forth the evidence in this record in greater detail, as the judgment and sentence of the defendants must be reversed and the cause remanded for a new trial because of the erroneous rulings and prejudicial errors of the trial court, which deprived the

defendants of a fair and impartial trial. The parts of the record which disclose the erroneous rulings and prejudicial remarks of the court require more extensive detail to show the necessity of a reversal of the judgment.

After twelve jurors had taken their seats in the jury box the judge made a general statement to them of the nature of the case to be tried. He then stated that the jurors were the same men who sat on a jury in a criminal case the day preceding the calling of this case for trial and asked the jurors if they knew any of the witnesses or the attorneys on either side of the case. There was no response by any of the jurors to that question. The defendants were then called by the court, and each of them and their names were made known to the jurors. The court informed the jurors that the defendants were represented by Burke & Crane as attorneys and that Marowitz and Wahl represented the State. The court then informed the attorneys in the case that they were in the case tried "yesterday" and that after knowing the jurors they were informed as to their requirements. Crane, for the defendants,. protested to the court that the defendants in this case were not the same defendants in the case tried the day before and that his clients had the right to examine the jurors. The court replied that if there were any of the jurors that were not on the jury "yesterday" they could question and qualify those jurors. The court then said to the twelve jurors: "Having heard what this case is about and knowing the principles of law that govern the trial in a criminal case, can you be fair and impartial to both sides in this case, follow the law, listen to the evidence and return your verdict on the evidence?" The jurors replied, "Yes, sir."

The court having indicated to the attorneys that they should proceed with the selection of the jury, Marowitz asked one of the jurors his name. The court at once stopped the juror from answering the State's attorney by exclaiming: "No! no! no! All these men answered those ques-

tions yesterday and you accepted them. You don't have to get the names of the old jurors." It being made apparent that the court would not tolerate further questions on the *voir dire* examination of the jurors who sat in the criminal case the day before, the State's attorney tendered the whole panel of twelve as jurors in the case. Crane then proceeded to interrogate one of the jurors, and after ascertaining his name and residence and that he sat on the other criminal case tried the day before this case was called, said to the juror: "The court will undoubtedly instruct you that before you can find the defendants guilty the State must prove its case beyond a reasonable doubt and to a moral certainty that they are guilty as charged, and if you then cannot—" The court at once interrupted the attorney and said: "No! no! no! That was all asked him yesterday. You accepted him and that is all clear." Crane replied: "Your honor, this is not the same case or the same defendants. I wish to object." The court replied: "That is not the law. The Supreme Court has laid down the law." Crane then said to the court he wanted to tell the jury what was the law of the case on trial. The court refused outright to let counsel explain to the jury the law by which they should be guided in rendering their verdict. After further questions were asked by counsel, which were overruled by the court, the following took place:

Mr. Crane: "I tender the first four.

The court: "Wait a minute; he tendered you the first twelve.

Mr. Crane: "You know, do you not, gentlemen, what this case is about? You sat on a case yesterday?

The court: "No, sir; no, sir; they did not.

Mr. Crane: "Most of them.

The court: "Gentlemen, you understand that you are to try this case upon the testimony in this case; you understand that, don't you?

The jurors: "Yes, sir.

154

The court: "All right; they have been qualified along these lines.

Mr. Crane: "But, your honor, these are not the same defendants; these are different defendants; they may be interested in knowing who are the jurymen and what their occupations are.

The court: "That don't make any difference; you got all those yesterday.

Mr. Crane: "First gentlemen; what is your name?

A. "Cecil J. Chapel.

The court: "You had the names of these men yesterday.

Mr. Crane: "No, I did not; I was not in that case.

The court: "Your associate did; they were obtained on the part of your office.

Mr. Burke: "We represent separate defendants, Judge.

The court: "You were here yesterday.

Mr. Crane: "What is your name?

A. "C—

The court: "No; you are not going into that right now; don't answer.

Mr. Crane: "Well, I will ask him another question. Where do you live?

A. "5643 North Kedvale avenue.

Q. "What is your business?

A. "Salesman.

Q. "By whom are you employed?

A. "I was last employed by the Red Top Metal Company.

Q. "How long were you with them?

A. "Six months.

Q. "Before that, what was your business?

The court: "I am not going to let you ask what was his business for the last sixty years.

Mr. Crane: "I am not going back sixty years.

The court: "I won't let you answer that.

Mr. Crane: "Were you, or the immediate members of your family circle of friends, ever the victims of a crime of violence?

The court: "I asked that question; I asked that question; don't repeat. Now, listen, gentlemen. I thought I had made myself clear about it. I do not allow any man in this court room, whether he is the State's attorney or whether he is attorney for the defense, to ask questions of that kind in the examination of the jury. I regard such matters as unnecessary. It don't make any difference what happened to others; confine your questions to him.

Mr. Crane: "I asked him if he or his family had ever been the victims of a crime of violence.

The court: "I asked them all that, and they said, no.

Mr. Crane: "Have any of your friends or relatives ever been the victim—

The court: "I don't care if any of his friends were ever held up."

After one of the attorneys for the defendants had asked other jurors a few questions the jury were accepted and sworn. There were no challenges of jurors for cause and only one peremptory challenge was made on behalf of the defendants.

Under the law of this State a defendant is guaranteed in every criminal case a trial by a fair and impartial jury, and, to the end that such a jury may be had, the right to peremptory challenges of jurors is given to him. A defendant has a right to examine prospective jurors to ascertain their occupations, habits and associations so far as they might tend to influence them in exercising judgment in the case. He has also the right to make any reasonable and pertinent inquiries to ascertain whether the minds of the prospective jurors are free from bias or prejudice, so as to enable him to exercise his right of peremptory challenge intelligently. (*Donovan* v. *People,* 139 Ill. 412; *People* v. *Redola,* 300 id. 392.) While a trial judge has a

discretion to limit the extent to which attorneys may go in their examination of jurors, he has no right to deny a defendant the right to make all such reasonable inquiries of a juror as may enable him to determine whether or not such juror will be free from bias and prejudice in exercising his judgment in the case and as will enable the defendant to exercise his right of peremptory challenge intelligently. The trial judge in this case unduly restricted the attorneys for the defendants in their examination of the jurors. The defendants in this case were in no way bound by any part of the examination made by the court of the jurors in the criminal case tried before their case was called, as held by the trial judge. When the court stated to the defendants' attorneys, "I asked that question; I asked that question; don't repeat;" and when he further stated to the defendants' counsel, "I asked him if he or his family had ever been the victims of a crime of violence," the court had reference to the questions that he had asked the jurors in the other criminal case. He allowed no such questions to be asked in this case. The defendants had the right to have a complete record made of the examination of the jurors in this case on their *voir dire* examination. The fact is they were not in this case permitted to examine the jurors in a manner that would enable them to determine and exercise their right of peremptory challenge.

It is suggested by the attorneys for the State that the defendants did not exhaust all the peremptory challenges of jurors that were allowed them under the statute. The answer to this suggestion is, that the court put it entirely out of their power to exercise the right of peremptory challenges by denying their attorneys the right to make any sufficient examination of the jurors, on their *voir dire,* to properly determine or exercise their right to make peremptory challenges.

In the cross-examination of witness Tucker by the attorney for the defendants the following took place:

Mr. Burke: "When you say you went to the detective bureau three or four times prior to July 16th—

The court: "Were you, Mr. Tucker?

A. "Yes, sir.

Mr. Burke: "—the purpose of your visits at those times was to attempt to identify suspects?

The court: "He didn't say that.

Mr. Burke: "I am asking him, your honor.

The court: "You don't have to go to jail to identify suspects.

Mr. Burke: "You looked over them personally?

The court: "What if he did?"

During the cross-examination of the witness Bergfelt the following occurred:

The witness: "During the four times I was at the detective bureau the officers did not show me any pictures or photographs; I did not go into a room with the officers and they showed me pictures; I don't think I was there Sunday afternoon.

The court: "You went there Sunday afternoon?

A. "Yes; Sunday.

Mr. Burke: "I think I misunderstood you.

The court: "You only think you do. Did the police show you some photographs, do you remember?

The witness: "I went down there with Bill Sells, the route inspector; I remember who the other driver was that asked me to go down there and who the police officer was that asked any of the other men to go down there with me to look at the pictures; I don't know if Mr. Tucker went down there to look at the pictures; the other driver and I looked at the pictures; the other two that I picked out they resembled, and I said—I explained they were not the fellows; I couldn't tell you if one that I picked out was George Rabe.

The court: "He said he picked out someone that he said that resembled these same men.

Mr. Burke: "Your honor, I except to the remarks of the court. His words were that the other two that he picked out, one that resembled—

The court: "I heard that.

Mr. Burke: "Now, then, did all three of the men decide that this was their picture?

Mr. Marowitz: "Object, your honor.

The court: "No, no."

One of the character witnesses for DeLordo was the owner of a restaurant. In cross-examining this witness the assistant State's attorney asked him if he ever met DeLordo outside of the times that he ate in his restaurant, and the trial judge, without giving the witness an opportunity to answer the question, said, "Of course you saw him when he ate there. The only times you saw him was when he was in your restaurant."

One of the character witnesses for Kidd testified that he was a distributor for the *Southern Race Track Record* and the *American Race Track Record,* and the following examination of that witness by the court took place:

The court: "What is the racing record?

A. "It is a record of the racing—a newspaper—

Q. "Published where?

A. "25 E. Congress.

Q. "That is to bet on horses?

A. "Well, no, but it is about how the races—

Q. "It gives information?

A. "Yes, sir.

Q. "Of how to win money?

A. "It is just the past performances.

Q. "Upon which to base your bet?

A. "Yes, sir.

Q. "And always wins?

A. "Fifty-fifty times. (The court laughs.)"

In the examination of DeLordo by one of his attorneys the following occurred:

Mr. Crane: "Where were you taken from the place you were arrested?

A. "Over to Blue Island.

The court: "What difference would that make?

Mr. Crane: "They were brought through other cities.

The court: "No, no.

Mr. Crane: "Where were you taken in Blue Island?

The court: "What difference would that make, where they were taken? I won't let you ask that in this case.

Mr. Crane: "To explain the manner in which the identification was made.

The court: "No, no; let this witness testify to facts; that is what the witness has to testify to here.

Mr. Crane: "I am trying to do that."

In the cross-examination of the above witness he testified that he went to Michigan to visit John Brusinsky, and the following took place:

Mr. Marowitz: "Is he in court now?

A. "No, sir.

The court: "Where is he?

A. "I guess he is working.

The court: "Where?

A. "He drives a Lincoln truck.

The court: "Did you ask him to come, this man that you went to Michigan with, the 10th of July—

Mr. Marowitz: "The 10th of June, your honor.

The court: "—1929, or was it the 9th?

A. "The 9th—June 9th.

The court: "He is all right.

Mr. Marowitz: "Do you know where he is at the present time?

A. "No, sir.

The court: "Can you get him here?

A. "I can try.

The court: "Well, do you know why he is not here?

A. "I did not ask him to come.

The court: "Sir?

A. "I did not ask him to come.

The court: "You didn't ask him to come? Why not? He ought to be here."

Later in the cross-examination of this witness by the assistant State's attorney the following took place:

Mr. Marowitz: "Did you ask anybody to testify in this case for you?

A. "I didn't think it would be so bad.

The court: "What?

Mr. Burke: "I object to that and ask that it be stricken.

The court: "Overruled; it may stand; overruled.

Mr. Burke: "Exception."

After DeLordo had given his testimony the following occurred:

The court: "Do you want more time? Do you want to get some witnesses here to-morrow? If you do—if you have any other witnesses that you want to produce—we will adjourn.

Mr. Burke: "I don't imagine we would have time to get them here from Michigan; they would have to be in court by 10:30 to-morrow.

Mr. Crane: "It would not give us time by to-morrow to get Brusinsky in.

The court: "Sir?

Mr. Crane: "I think, your honor, we might try and get Brusinsky in.

The court: "He didn't want to see him."

Kidd testified that after he came back to Chicago from the cemetery on the day the robbery took place he went to his home and that his father and sister were there, and that he stayed at home about forty-five minutes and then went to a drug store and bought a package of cigarettes from Roy Reid, the drug clerk. In the cross-examination of this defendant by the State's attorney the following took place:

Mr. Marowitz: "Is Reid here?

A. "Who?

Q. "Reid, the drug clerk.

A. "No, sir.

Q. "Did you ask him to come here?

A. "No, sir.

Mr. Marowitz: "Is your father here?

A. "No, sir; my father is sick.

Mr. Burke: "Object, if the court please.

The court: "That is competent.

Mr. Burke: "The defendant does not have to bring in any witnesses. Exception."

The conduct of the trial judge in the trial of this case in making comments on the evidence, in interrupting the examination of witnesses, in asking questions of witnesses in such manner as to disclose his opinion as to the weight or credibility of their testimony, and in commenting upon the failure of the defendants to produce evidence, was very prejudicial to the defendants and is indefensible. (*People* v. *Wilson,* 334 Ill. 412; *People* v. *Rongetti,* 331 id. 581.) The action of the court in refusing to allow DeLordo to testify concerning the manner in which the identification of him as one of the robbers was made was erroneous. The main, if not the only, question in the case for the decision of the jury was whether or not the defendants were the men who committed the robbery, and the defendants had the right to show the manner in which they were identified by the witnesses as the robbers and the opportunity of the witnesses to make such identification, so that the jury might determine whether or not there was a likelihood that the witnesses for the People were mistaken on the question of identification. It was error to allow the assistant State's attorney, over the objection of the defendants, to ask them if they had asked certain persons to testify for them, and it was certainly erroneous and prejudicial to the defend-

ants for the trial judge to comment on their failure to produce evidence. *People* v. *Munday*, 280 Ill. 32.

Since the decision of this court in *People* v. *Bruner*, 343 Ill. 146, the rule is that the jurors in a criminal case are judges of the facts, only. It, therefore, was not error for the court to refuse to allow the attorneys for the defendants to read to the jury from the opinions of this court, as they sought to do. We are also of the opinion that the court did not err in modifying instructions requested by the defendants before giving such instructions to the jury.

For the errors of the court above set forth the judgment of the criminal court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*