THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JEROME PHILLIPS, Defendant-Appellant.

First District (2nd Division)    No. 79-2092

Opinion filed August 11, 1981.—Rehearing denied September 1, 1981.

James J. Doherty, Public Defender, of Chicago (Ina S. Marks and Donald S. Honchell, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Joseph J. McNerney, III, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant was tried on three counts of armed robbery, three counts of aggravated battery, three counts of unlawful restraint, four counts of

armed violence and attempt murder. He appeals from a judgment entered on jury verdicts of guilty as to three counts each of armed robbery and unlawful restraint, for which he was sentenced to 6 years in the penitentiary. The issues identified for our consideration are whether defendant was proved guilty beyond a reasonable doubt; and whether the *voir dire* conducted by the court was so cursory that it deprived defendant of the means with which to choose an impartial jury.

John L. Campbell testified for the State that on May 27, 1978, after leaving the Main Post Office, his place of employment, before 1 a.m., he walked toward a motel parking lot with his friend, Jimmy Coleman. They entered the ramp and a man, later identified as defendant, approached them with a weapon and announced a stickup. Campbell saw his face. Campbell and Coleman were instructed to get down on the ground, after which defendant started to search them. During the search Campbell "stared directly into" defendant's face. The nearest lights were two feet away. After defendant took Campbell's money and keys, he was required to put his hat over his face. At some point thereafter, another individual approached, who was told by defendant to search the victims, and that "he better find some money." That person searched Campbell and took his wallet. A fifth person, Carl Williams, arrived on the scene and was told to get on the ground by defendant. The fourth individual was instructed to search him. At that point a shot was fired. The two robbers fled as a police car drove into the parking lot. After learning that there had been a robbery, the two officers in the squad car gave chase. Later, Campbell viewed a lineup and identified defendant as the gunman. On cross-examination, Campbell was confronted with a statement made at the preliminary hearing that he did not know how far away the parking lot light was. He did not remember whether he had made it or not. Before entering the parking lot he had stopped at a tavern and had three or four beers.

Jimmy Coleman testified that while he was with Campbell in the parking lot, a man approached and announced a stickup. Coleman did not get a very good look at the man's face because his attention was drawn to the gun the man was carrying. Coleman's testimony comported with Campbell's in other respects but he added that when the gunman searched him he took $365, two silver dollars, a badge, his ring and his watch. Prior to searching him, the gunman removed his glasses. Coleman identified his ring and his watch, and stated both items were removed from him by the gunman and not by the other individual who later searched him. On cross-examination Coleman stated he was unable to identify anyone at the lineup.

Carl Williams, a post-office employee, stated that at 12:45 a.m. he proceeded to his car in the parking lot, accompanied by a woman. He

observed a group of men on the ground. Assuming that it was a "crap game," he greeted the men, but was told to "shut up" and get on the ground with the victims. He briefly saw the gunman's face, as his attention was drawn to the gun. The individual without the gun searched him, took his wallet and money, ripped his pants off, and pushed him back to the ground. After lying on the ground for two or three minutes, Williams thought the offenders had left and, looking up to see if he was correct, he was shot in the arm and side by the gunman. The individual without the gun said: "You shot once. We haven't got time for this. Let's get out of here." Williams then heard footsteps and he heard someone indicate where the suspects went. He was removed to the hospital.

Police Officer Edward Carter, who conducted the lineup, testified that neither Coleman nor Ms. Bracey (Williams' companion) was able to make an identification.

Also testifying for the State was Police Officer F. M. Holan. During the early morning hours of April 28, 1978, he was in a squad car with his partner, Officer Walter Koltonuk, in the driveway of the nearby motel. After hearing a shot, they drove toward the sound. As they approached, Officer Holan observed two men run away from a group of people. Several individuals in the group shouted that they had just been robbed. The two officers gave chase, lost the suspects briefly, and then came upon them standing in a parking lot. Upon being ordered to stop, the two suspects started to run. Officer Holan chased them on foot, stopping only briefly to pick up a revolver from the sidewalk. Officer Holan found the weapon to contain five live rounds and one expended round. The gun smelled like it had been fired.

Officer Koltonuk's testimony was substantially the same as Holan's. In addition, he stated that while chasing the two suspects, one of whom was several inches shorter than the other, he saw the shorter suspect "go down," and lost sight of the taller person. He looked under a parked automobile and observed defendant lying part way underneath the car next to the curb. With his gun drawn, he handcuffed one of defendant's hands. Defendant began crawling out from underneath the car. Once his foot was part way onto the sidewalk, he lunged forward. After being pulled two or three feet, Officer Koltonuk subdued defendant, placed the other handcuff on him, and removed $254 jammed into defendant's top pocket. In addition, Officer Koltonuk found a ring, two silver dollars, a post-office I.D. card with Coleman's name on it, and "a bunch of keys" in defendant's pockets and another ring, a key, and a watch on the ground within a car's length of the place where defendant was arrested.

Defendant testified in his own behalf. From 1971 to 1973 he worked at the Main Post Office. On paydays he would participate in dice games which took place in the vicinity of the post office, especially near the

motel and in front of the tavern on the ramp at Harrison Street. After he stopped working at the post office, he would sometimes return to play dice. During the late night hours of April 27, 1978, he participated in one such dice game, which broke up when police approached. He walked toward the motel and, after the police left, he walked back to the game on the ramp. Again the game broke up with the approach of police; however, when he returned again, there were no people on the ramp. He walked to the bottom of the ramp near the parking lot and saw two people lying down and one kneeling. The latter had a gun and he told defendant to "come here" and "go through their pockets." He began to search one of the people lying on the ground. Thereafter Williams approached and was instructed to get down on the ground. Then another person came down the ramp, saw what was happening, and ran away. A shot rang out, and defendant began to run. He was holding some cash, a watch, and a ring which he had removed from the individual on the ground. The man with the gun chased him and told him to stop. Defendant ran through a parking lot, and then halfway down a street before hiding near the side of a car. He thought that by doing so he could escape from the man with the gun. Sometime later, a police officer approached, handcuffed him and hit him on the head with his gun. The officer told defendant that if he found a gun he was going to kill him. He was taken to the station, where an investigator told him that the man who had been shot was dead. Defendant told the investigator that he was instructed to search the victim's pockets by a man with a gun. He did not see a police car, did not hear Officer Holan speak during the chase, and did not lunge in an effort to escape after he was arrested. He did not discard any property at any time. The defense rested its case in chief.

The State called Officer Koltonuk in rebuttal, who testified that he never hit defendant with his gun, nor did he offer to shoot him. The State also called Officer Carter in rebuttal. He testified that prior to the lineup, defendant stated that he was a "victim of circumstances regarding a crap game." Defendant did not at any time tell Officer Carter that he was ordered at gunpoint to search the victims. Officer Carter did not tell defendant that one of the victims of the armed robbery had died.

It was upon the foregoing evidence that the case was submitted to the jury and upon which defendant was found guilty, as first noted above.

Defendant first argues that he was not proved guilty beyond a reasonable doubt. He claims the evidence establishes that: the area is known for dice games; a man with a gun ordered a second man to search the victims; the two participants in the robbery did not approach the victims together; only Campbell testified that Phillips had a gun, and his vision was obstructed most of the time by the hat covering his face. Thus defendant argues Campbell did not have an adequate opportunity to

observe. Defendant claims that the evidence shows that he was the unarmed second participant in the robbery and was forced to search the victims by the armed man.

■■ There was ample evidence upon which the jury could have found otherwise. Campbell saw defendant with the gun as he announced a stickup and identified him in a lineup. Campbell's opportunity to view defendant was sufficient since the nearest light was only two feet away and he stared directly into defendant's face. He identified defendant at a lineup held within a short time after the robbery and shooting, and again at trial. As to compulsion, the jury had the right to believe Officer Holan's testimony that when he came upon defendant and the other suspect in a parking lot and ordered them to stop, defendant instead chose to run, which negates the theory that defendant did only what he was forced to do. Further, his effort to escape while being handcuffed after he was found hiding under a parked automobile severely erodes the mold of compulsion into which defendant sought refuge. Where the identification of an accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and he viewed the accused under such circumstances as would permit a positive identification to be made. (*People v. Stringer* (1972), 52 Ill. 2d 564, 569, 289 N.E.2d 631.) Defendant's reliance upon *People v. Cullotta* (1965), 32 Ill. 2d 502, 207 N.E.2d 444, and *People v. Carroll* (1970), 119 Ill. App. 2d 314, 256 N.E.2d 153, is misplaced since in neither was the identification of the accused as clear and positive as that in the instant case.

Defendant next argues that the *voir dire* conducted by the trial court was cursory, meaningless, deprived him of an opportunity to demonstrate that prospective jurors were challengeable for cause and denied him the opportunity to intelligently exercise his peremptory challenges. Defense counsel submitted 45 written questions that he suggested be asked by the court of prospective jurors. Of the 45, 20 contained multiple parts, so that a total of 137 questions were proposed. Examples from among the questions were: is your present residence a single or multi-family dwelling; do you participate in or belong to any clubs, community groups, organizations, societies, religious or political groups; what are your spare time activities, hobbies and vacation interests; what magazines, newspapers and publications do you purchase or subscribe to; if you serve (on the jury) will you be patient during the many, many delays when you may be waiting in the jury room; is there anything about the appearance of any of the attorneys that bothers you at this time; and you realize that your ability to recognize someone depends upon the amount of time, lighting or excitement; you realize that policemen make mistakes, have biases and motives, overdo their job, even lie, like other humans; Perry Mason so

often comes up with the real culprit at the end of his case, you don't expect the defendant in this case to come up with the real culprit, do you; if the prosecution fails to prove its case in any respect whatsoever, what verdict would you return; would you ever guess anyone's liberty or good name away; do you believe (that because defendant has been arrested and charged) that where there's smoke there must be fire; you don't think that because the name of this case is as it is, that all the people of the State of Illinois are against this defendant, do you?

Some of the other questions proposed by the defense to be asked encompassed subject matter reflected in the pattern jury instructions given to the jury by the court prior to their deliberations. Certain other questions extended to propositions of law. At one point during conferences between court and counsel relative to *voir dire*, the court asserted, "We can't waste your [sic] time about your hypothetical theories about what jurors should be that you get out of some dumb book. Now, do you want them or don't you?" Defense counsel responded, "Let the record show that you did not ask any of the questions that I submitted."

The record reveals that prospective jurors were first advised by the court as to the criminal nature of the case; the differences in requisite proof in civil and criminal cases relative to proof beyond a reasonable doubt; the nature of an indictment, which the State had the burden of proving; the charges made against defendant; where, when and against whom the alleged offenses were committed; and the presumption of innocence, among other things. The transcript shows that the court then questioned the jurors regarding their addresses, who they lived with, their employment and the employment of their spouses and adult family members. The court asked whether they had relatives or friends employed in law enforcement or police agencies and whether they or their friends or relatives have ever been victimized by crime and, if so, whether that experience would prevent them from giving either side a fair trial. The court also interrogated the prospective jurors generally as to their ability to be impartial and give both sides a fair trial. The supreme court in *People v. Lobb* (1959), 17 Ill. 2d 287, 161 N.E.2d 325, considered the questions of scope and extent to which *voir dire* of prospective jurors may be effectuated, toward the end that the only legitimate function and purpose of that examination may be fulfilled, namely, to secure an impartial jury (17 Ill. 2d 287, 301). In doing so, the supreme court made several observations of particular application to the instant circumstances, stating (17 Ill. 2d 287, 300-01):

> "This court has also recognized that the scope and extent of the *voir dire* examination rests within the discretion of the court and is subject to reasonable limitation. (*People v. DeLordo*, 350 Ill. 148; *People v. Robinson*, 299 Ill. 617; *Pennsylvania Co. v. Rudel*, 100 Ill.

603.)˙ It has never been suggested that a reasonable limitation on *voir dire* examination operates to deprive a litigant of his right to a jury trial. However, a failure to permit pertinent inquiries to enable a party to ascertain whether the minds of the jurors are free from bias or prejudice which would constitute a basis of challenge for cause, or which would enable him to exercise his right to peremptory challenge intelligently, may constitute reversible error. *People v. DeLordo*, 350 Ill. 148.

In *Falter v. United States*, 23 F.2d 420, at page 426, Judge Learned Hand, in discussing the conduct of the *voir dire* examination of jurors, stated 'while it is the custom at common law to allow the parties to cross-examine, there is nothing in this essential to securing a panel free from bias. The length and particularity of the examination of jurors had become a scandal, and required some effective control. So long as the power is exercised with reasonable regard for the rights of the accused, it fulfills the requirements of the law.' "

Also commenting on and disapproving unnecessarily lengthy and excessive questioning of jurors are courts in other jurisdictions. See, *e.g.*, *People v. Crowe* (1973), 8 Cal. 3d 815, 824-28, 506 P.2d 193, 199-202, 106 Cal. Rptr. 369, 375-78; *Parson v. State* (Del. 1971), 275 A.2d 777, 783-84; *State v. Manley* (1969), 54 N.J. 259, 255 A.2d 193, and authorities discussed in each.

■■ The kinds of questions suggested by defendant, as represented by the sampling set forth in the next preceding paragraph, demonstrates an attempted return to the excesses which the courts have been seeking to obviate and ameliorate by rule (Ill. Rev. Stat. 1979, ch. 110A, par. 234) and by decision (see, *e.g.*, *People v. Thornton* (1977), 54 Ill. App. 3d 202, 207, 369 N.E.2d 358). The numbers and types of questions sought by defense counsel to be asked of the prospective jurors in the instant case strongly suggest that the defense was seeking particular kinds of jurors, rather than simply fair and impartial jurors, the latter of which were all defendant was entitled to have serve. *Brown v. New Jersey* (1899), 175 U.S. 172, 175, 44 L. Ed. 119, 120-21, 20 S. Ct. 77, 78; *People v. Jackson* (1977), 69 Ill. 2d 252, 260, 371 N.E.2d 602; *People v. Lobb* (1959), 17 Ill. 2d 287, 302. ·

Defendant asserts that the court denied him the right to ask follow-up questions of jurors and that the court itself refused to ask such questions at defendant's request. Our examination of the record reveals otherwise, however. Follow-up questions were indeed asked, and to an extent sufficient as to apprise the defense of the abilities and capacities of the prospective jurors to render a fair and impartial decision in the case. Of those questions suggested by defense counsel that the trial court declined to ask, we cannot say that, viewing the questioning in its entirety, together

with the jury instructions given at the close of the evidence, the court's refusal to propound such questions rose to the level of an abuse of the trial court's discretion. *People v. Jackson; People v. Lexow* (1962), 23 Ill. 2d 541, 544, 179 N.E.2d 683; *People v. Lobb.*

■■ ■ Defendant maintains that the jury should have been questioned concerning his proposed compulsion defense, relying upon *United States v. Dellinger* (7th Cir. 1972), 472 F.2d 340, in which the defendants successfully challenged the *voir dire* as too perfunctory to allow them to exercise their peremptory challenges, and relying upon *People v. Moore* (1972), 6 Ill. App. 3d 568, 286 N.E.2d 6, in which the defendant was granted a new trial because, among other reasons, the trial court refused to question the prospective jurors concerning their attitudes toward an insanity defense. Defendant states that just as jurors may be prejudiced against the defense of insanity, so might they view the defense of compulsion with mistrust. As previously noted, the *voir dire* pursued in the present case was not of such a perfunctory nature as to deny defendant any bases for determining the existence or absence of grounds upon which to exercise challenges for cause or for peremptory reasons, unlike *Dellinger*. With respect to the compulsion defense, a similar contention was made in *People v. Byer* (1979), 75 Ill. App. 3d 658, 670, 394 N.E.2d 632. The appellate court there held, as we hold here, that such questions are prohibited by Supreme Court Rule 234 as touching upon " 'matters of law or instructions.' " (See also *People v. Witted* (1979), 79 Ill. App. 3d 156, 164, 398 N.E.2d 68.) *Voir dire* may not be used as a vehicle for pre-educating and indoctrinating prospective jurors as to a particular theory or defense or impanelling a jury with particular predispositions; it is limited to the selection of an impartial jury. (See *People v. Nicholson* (1978), 61 Ill. App. 3d 621, 626, 377 N.E.2d 1063.) The jury was properly instructed with respect to the compulsion defense and was obligated to follow the law stated in that instruction. Defendant makes no argument with respect to the impropriety or insufficiency of the instruction given.

No contention is made in the present case that the jury finally selected was not fair or impartial; no prejudicial error is inferable under such circumstances. *People v. Jenkins* (1980), 88 Ill. App. 3d 719, 727, 410 N.E.2d 1145; *People v. Carruthers* (1974), 18 Ill. App. 3d 255, 261, 309 N.E.2d 659.

For the foregoing reasons we see no basis upon which to disturb the jury verdict or judgment in this case. Accordingly, we must affirm.

Affirmed.

DOWNING and PERLIN, JJ., concur.