THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHEILA BEASLEY, Defendant-Appellant.

Fifth District   No. 5—92—0049

Opinion filed November 1, 1993.

CHAPMAN, J., specially concurring.

Daniel M. Kirwan and E. Joyce Randolph, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Rod Wolf, State's Attorney, of Harrisburg (Norbert J. Goetten, Stephen E. Norris, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MAAG delivered the opinion of the court:

The defendant, Sheila Beasley, was convicted by a jury of second-degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—2(a) (now 720 ILCS 5/9—2(a) (West 1992))) for shooting her husband to death. The trial court sentenced the defendant to eight years' imprisonment. The defendant appeals contending that: (1) the evidence established self-defense; hence, she was not proved guilty beyond a reasonable doubt; (2) the trial court erred in dismissing two potential jurors *sua sponte*; and (3) her sentence should be reduced in view of several mitigating factors. We affirm.

The relevant facts can be summarized as follows: The defendant married Luther Glen Beasley (hereinafter Glen) in April of 1983. During the course of their marriage, three children were born: Luke, Amanda, and Nathan. Amanda and Nathan have cystic fibrosis and Amanda also has leukemia. According to the defendant, Glen did not physically abuse her until approximately two weeks after they were married. On that occasion, Glen disparaged the defendant's domestic abilities. In the months and years that followed, Glen physically and

verbally abused the defendant often. Without going into the specific details of each instance of abuse, suffice it to say that the defendant was beaten for reasons ranging from the defendant forgetting to purchase Ding Dongs on a shopping trip to the defendant talking or dancing with another man, inciting Glen's jealousy. The effects of Glen's abuse toward the defendant ranged from giving her bruises, scratches, and a black eye to breaking her tailbone and forcing her to have intercourse with him. The defendant testified that the abuse occurred when Glen was intoxicated, which was a quite frequent occurrence. The defendant stated that Glen would stay out drinking with his friends after work and that he started taking drugs.

The defendant met Kevin Rice while she worked for his mother at Baby World. In September of 1990, the relationship between the defendant and Rice consisted of merely talking on the telephone about every other day. In October, a sexual relationship developed. The defendant claimed that she started the affair with Rice because: "[There was] no emotion, no love at home, and I just needed a hug instead of a slap all [of] the time. I needed somebody to compliment me instead of putting me down. I just needed somebody in my life that felt like I was a human and not a piece of trash." Rice and the defendant had sex on only four occasions and were never considering a future together.

The defendant discovered that she was pregnant at the beginning of January 1991. Since Glen had had a vasectomy after Nathan was born, the defendant knew that the baby was Rice's child. The defendant contacted Rice and told him that she was pregnant and intended to have an abortion. Rice agreed with the defendant's decision. This ended the defendant's and Rice's relationship.

Julie Cozart, one of the defendant's best friends at that time, called and made an appointment for the defendant to have an abortion on January 18, 1991, at 9 a.m. The defendant and Julie agreed that they would tell everyone that they were going to Nashville, Illinois, to shop at a craft store. On January 16, 1991, the defendant borrowed some used sanitary pads from Julie. She borrowed the pads so Glen would think that she had started her menstrual cycle and would not be suspicious when she was bleeding after she returned home from having the abortion.

On January 17, 1991, at approximately 3:30 a.m., Glen came home. The defendant heard him take his clothes off and get into bed with Luke. The defendant had started to go to sleep and heard a loud crash. She immediately ran into Luke's bedroom. Glen had knocked over a three-tier marble nightstand and was "bouncing off [of] the

furniture, he couldn't walk, he was staggering *** and started urinating *** on the patio." Luke started crying. The defendant asked Glen if he had gone to work and he replied, "No, I didn't go to work, *** I found some good drugs and I have been out doing them." The defendant told Glen that he was drunk, and she began to leave the room. Glen shoved the defendant to the floor. Each time the defendant would begin to get up off of the floor, Glen would take his foot and push her back down. Glen eventually allowed the defendant to go to bed.

At 8 a.m. on January 17, 1991, the defendant and Paula Via left to take Amanda to the hospital for leukemia treatments as the defendant did every Thursday. Glen was asleep when they left. When they returned home at 4 p.m., Glen had left for work. On the evening of January 17, 1991, Glen called the defendant from work at 6 p.m. and 9 p.m., as he always did. The 6 p.m. conversation consisted of Glen requesting that the defendant call his uncle to give him a message. The defendant complied with Glen's request. At 9 p.m., Glen called the defendant again to make sure that she had done what he had requested of her in the 6 p.m. conversation. There was no indication in either of these phone conversations that Glen was upset or mad at the defendant. On the evening of January 17, 1991, Luke was home with the defendant. Amanda and Nathan were staying with Raymond and Katherine Ewell, the defendant's parents, since the defendant and Julie were leaving early the next morning. The defendant had also made plans with Lia English to take Luke to school at 8 a.m. on January 18, 1991.

On the evening of January 17, 1991, the defendant went to bed at approximately 10 p.m. At 1:30 a.m., she awoke and heard Glen coming into the house. She heard him take his clothes off, put them into the hamper, and fix himself something to eat. The defendant went back to sleep. The next thing that the defendant recalled was Glen grabbing her by the hair on her head and leading her into the living room. Glen knelt down in front of the defendant and told her that she was a "bitch" and did not deserve to live. He told her that he was sick of her "bitching at him about his drinking." The defendant said that she could smell alcohol on Glen's breath. He further disparaged the defendant about giving him two sick children and told her that she could not do anything right. The defendant stated that anytime she tried to reply, Glen slapped her in the face. This occurred approximately 10 times that evening.

Glen continued to call her names and tell her that she did not deserve to live. He told her that he was going to kill her and that she

should not close her eyes because she would not wake up again if she did. The defendant said that Glen had a strange look in his eyes "like he was the devil," and that his appearance was different than it had been on previous occasions when he had beaten her. Eventually, Glen grabbed the defendant by the arm and took her into the bathroom and told her to get down on her hands and knees in front of the toilet. The defendant told Glen, "no," and he shoved her down and asked her if she had ever thought about drowning. He proceeded to grab the defendant by the back of the head and put the defendant's head into the stool water. Glen did this to the defendant twice and held her head under the water for 9 to 10 seconds each time. She said that he had never done this to her on previous occasions when he had abused her.

Glen took the defendant back into the living room, and a news channel was reporting information about the war. Glen told the defendant that the soldiers did not deserve to die, but she did. At 2:30 a.m., Glen lay down on the couch and went to sleep. In the past, Glen would finally pass out, and the abuse would end for the evening. The defendant walked into the bedroom and climbed into bed. Glen yelled for her to come back into the living room. She complied and asked Glen why he was treating her so poorly.

The defendant walked into the kitchen to fix herself something to drink and saw a picture of a baby in a casket beside Glen's lunch box. It was a picture of Glen's baby sister, Geri, who had died when she was an infant. Glen told the defendant that Geri looked like Amanda. The defendant told Glen that Amanda was not going to die. Glen replied to the defendant: "[Amanda] might not [die] but you're going to." Glen lay down on the couch again, and the defendant went to look for his handgun; however, it was not in its usual location. The defendant testified that she assumed that Glen must have had the gun in the living room with him since it was gone.

The defendant took the cordless phone into the living room closet and called Kevin Rice. She told him that she needed his gun for protection. Rice said "no." The defendant explained to Rice that she needed his help because Glen was going to kill her. Rice asked her what she wanted him to do, and she told him to put the gun by the dog pen behind her house. The defendant stated that even though Glen had abused her in the past, she had never felt like she needed a gun for protection. The defendant stated that on January 18, 1991, however, Glen acted "like the devil was coming out of him," and she was afraid that he was going to kill her.

When the defendant heard the dogs barking, she went out of the back door and saw a bag beside the dog pen. She brought it into the bedroom, went into the closet, opened the bag, and looked inside of it. The defendant did not leave at that time because Luke was in the house and Glen was acting so violent that the defendant was afraid that he might harm Luke. The defendant was also fearful that if she left, Glen might try to follow her to her parents' or the Cozarts' home and kill all of them. The defendant did not call the police because she had called them in the past and felt that they had tried to get her and Glen to work their problems out instead of being concerned about helping her. Additionally, the defendant stated that some of the policemen were Glen's friends. The defendant left the gun inside of the closet and went to bed. Glen was asleep at this time. Eventually, Glen came into the bedroom, took the defendant into the bathroom, and forced the defendant to get down on her hands and knees. Glen put the defendant's head into the stool water twice as he had before. Water was running down the defendant's face. As she reached for a towel, Glen grabbed a used sanitary pad out of the trash and wiped the water off of the defendant's face with it. Glen told the defendant that he knew that it was Julie's pad and not the defendant's pad. This was the first indication that the defendant had that Glen might have known about her pregnancy and the upcoming abortion.

The defendant ran to the front door, and Glen grabbed the back of her shirt and pulled her backward. Glen told the defendant that if she ran away, he would find her and kill her and anyone that might be with her. Glen told the defendant to sit down. She sat by him on the couch and told him that she loved him, and she tried to comfort and calm him down. This had worked on previous occasions when Glen was violent; however, this time, he told the defendant to get away from him and not to touch him. Glen threatened to kill the Cozarts and the defendant's parents. Glen reiterated that he was going to kill the defendant, told her not to close her eyes, and told her that she did not deserve to live. Glen went to sleep again.

The defendant realized that she did not know how to use the gun, and she called Rice for instructions on the operation of the gun. Rice gave the defendant instructions, and according to Rice, he asked the defendant if she planned to kill Glen. The defendant replied "yes." In her testimony, however, the defendant denied telling Rice that she had planned to kill her husband. After talking with Rice, the defendant stated that she pulled the gun back so that it was in a position that was ready to fire, and she placed the gun underneath the bed.

Glen called the defendant back into the living room, repeating the same threats that he had previously made. He told the defendant that he was going to kill her and make it look like a suicide. The defendant told Glen that everyone would know that he killed her, and he said that he did not care if he was sent to prison for the rest of his life. Glen ordered the defendant to go to bed and think about dying. According to the defendant, she called Julie and told her that Glen was "going crazy" and warned her not to come over because she feared for Julie's safety. According to Julie, the defendant called her about 4 a.m. and said "I think he knows," referring to her pregnancy. In her testimony, however, the defendant denied telling Julie that she thought that Glen knew that she was pregnant by another man.

About 6:30 a.m., Glen summoned the defendant to the living room. The defendant placed the gun into her underwear, put her hand on her stomach to hold it, walked into the living room, and sat down on a chair. Glen told the defendant, "This is it." He went into the bathroom. While he was gone, the defendant placed the gun underneath of the chair in which she was sitting. Glen came back, bent down in front of the defendant, and said "I can't believe that I married a bitch like you." He told the defendant that she had ruined his life for the past eight years. Glen proceeded to shove the defendant back into the chair, which caused the gun to be exposed. Glen asked the defendant what she was doing with the gun. Initially, the defendant denied having any knowledge about the gun. Then, the defendant told Glen that she needed the gun for protection because she was afraid that he was going to kill her.

Glen demanded that the defendant open her mouth. After she refused to do so several times, Glen grabbed her cheeks, opened her mouth, and pried the gun between her teeth. Glen yelled "bang," pulled the gun out of the defendant's mouth, looked her straight in the eyes, and laughed at her. The defendant was shaking and crying. Glen lay down on the couch and placed the gun on the floor beside him. Glen told the defendant to go to bed and think about dying because he was going to let her think about it before he killed her. The defendant pleaded with Glen, asking him not to kill her. When Glen closed his eyes, the defendant put on a sweat suit and her shoes. As the defendant passed the living room, she could see that Glen was starting to mumble and move around. The defendant supposedly thought that Glen was getting ready to get up and kill her. The defendant fell to her knees, closed her eyes, and pulled the trigger. She dropped the gun and ran to Luke's bedroom. She woke Luke up and called Lia English to tell her not to come by her house to take

Luke to school. The defendant told Luke to stay in the bedroom and to put his clothes on. The defendant picked the gun up and placed it in her pants. She never looked at Glen after she shot him. In fact, the defendant testified that she could hear Glen snoring as she was leaving the house. The defendant opened the front door and went out of the back door after putting the gun into a sack.

Julie Cozart testified that at approximately 7:10 a.m., the defendant called her to tell her that they could not go to the clinic because Glen would follow them. She stated that the defendant's voice was normal. After the defendant took Luke to school, she went to Julie's house. According to the defendant, she told Julie and Julie's husband, Steve "Merle" Cozart, that she thought that she had shot Glen. Julie and Merle testified, however, that the defendant told them that she had killed Glen. Julie thought that the defendant appeared to be "cold" and different. Julie testified that the defendant told her that she killed Glen because he was going to make her take a pregnancy test the next morning and, if it was positive, he was going to kill her. Julie said that the defendant did not complain to her that Glen had physically abused her the evening before the shooting. Further, Julie testified that the defendant told her that she planned to return home, pretend to find Glen, and run out of the house screaming.

Even though the facts are in dispute about how Julie and the defendant left together, the fact remains that they did leave together at some point. The defendant disposed of the gun somewhere around Benton, Illinois, while she and Julie were together, after wiping her fingerprints off of the gun with a napkin. Julie and the defendant eventually returned to Harrisburg. The defendant testified that, at this time, she was still unsure whether Glen was alive. After the defendant returned home, she said to Glen, "Hey, Bud, you better get up[,] it is time to go to work." The defendant stated that she noticed blood all over the pillow that Glen was lying on and she ran out of the door. According to the defendant, at that moment, she realized that she had killed her husband. She ran to a neighbor's home for help. Florence McAnnally, her neighbor, called an ambulance. When the ambulance arrived, the attendants determined that Glen was dead.

Police officers Dee Pelhank and Gary Crabtree arrived on the scene immediately after the ambulance. Officer Pelhank testified that he attempted to engage the defendant in conversation about the murder, but she was very upset and about to start vomiting. Later, the defendant told Pelhank that she had gone shopping with Julie Cozart for the morning and when she returned home, the main door to her home was partially open and the inside front door was all of the way

open. This interview was terminated because the defendant was crying and getting sick to her stomach again. A couple of hours later, they interviewed the defendant again. The defendant never mentioned that she and Glen were having marital problems until after she confessed to killing him. The defendant told the officers that she recalled the front door being locked when she left on the morning of the shooting. The remainder of the story was substantially the same as the defendant had previously stated. The defendant requested a third interview to clarify something she had told them in an earlier interview; however, no new relevant information was discovered.

Sgt. Dave Elwood, Illinois State policeman, testified that he was involved in all three interviews with Officer Pelhank and the defendant. On January 19, 1991, Julie Cozart led Elwood and Master Sgt. Ken Clore to the location where the defendant had disposed of the gun which she had used to kill Glen. Clore and Elwood located the gun, which was in a sack located in a creek. Sgt. Gary Otey, crime scene technician, subsequently took custody of the gun. Elwood returned to the Saline County sheriff's office at 12:25 a.m. on January 20, 1991. The defendant stayed at her parents' home on the evening of the shooting. He and Sgt. Bill McClement went to the defendant's parents' home in the early hours of the morning on January 19, 1991. Elwood indicated to the defendant's mother that he needed to ask the defendant some more questions because he had discovered some new developments in Glen's case. The defendant agreed to go to the sheriff's office to answer more questions. Elwood advised the defendant of her *Miranda* rights and told her that they had retrieved the gun. Initially, the defendant denied having any knowledge about the gun. Elwood told her to stop lying and to tell the truth. The defendant put her head in her hands and began sobbing and crying with pronounced shaking. She told Elwood that Glen had been beating her and was going to kill her and her family.

Although Elwood reiterated much of what the defendant had testified to regarding the night of abuse that she had suffered at the hands of her husband, she left some of the details that she had told Elwood out of her testimony at trial. For example, the defendant told Elwood that she called Julie and told her that she had slept later than she had planned and that she would meet Julie at her house, rather than Julie picking her up at the defendant's house as they had previously planned. Sometime between the phone call to Julie and the phone call to Lia, the defendant told Elwood that she sat on the bed and cried. Eventually, she went into the living room where Glen was asleep on the couch and sat in a chair. Glen continued to sleep. She

called Lia and told her not to pick Luke up as they had previously planned. The defendant went back into the living room and sat down on the chair again. She went into the bedroom, picked the gun up, knelt down beside Glen, and said a prayer to God asking for forgiveness. The defendant told Elwood that she stood up, kissed Glen on the lips, and said "I'm sorry." She pointed the gun at Glen's head and, at a distance of less than two feet, fired the weapon. On cross-examination, however, the defendant denied that she told Elwood that she kissed Glen on the lips before she killed him. Elwood testified that the defendant's answers were not spontaneous and, at times, the defendant paused a couple of minutes before answering many of the questions.

Dr. John Heidingsfelder, a forensic pathologist, testified that the right side of Glen's head had an apparent gunshot wound. It was Dr. Heidingsfelder's opinion that this wound was an entrance wound. The exit wound was on the left side of the head. Dr. Heidingsfelder also found a bullet entrance wound to the left shoulder. Dr. Heidingsfelder believed that this wound was the same one that had passed through Glen's head. He opined that, given Glen's wounds, he could have been unconscious for two to five minutes after the shooting and he died from a cerebral disruption of the brain or disruption of the brain tissue due to a gunshot wound to the head.

Dr. Michael Althoff, psychologist, testified that he had treated approximately 50 women who had been abused by their spouses. Dr. Althoff stated that he had examined the defendant on several occasions since the shooting. He also interviewed the defendant's family and friends. Dr. Althoff concluded, after reviewing the defendant's personality test results, the notes of his interviews with family and friends, and the police reports on the shooting, that the defendant suffered from battered woman's syndrome at the time that she shot the victim. Dr. Althoff also stated that it was his understanding that the defendant shot Glen while he was asleep even though he might have been stirring from his sleep.

The defendant's testimony relating to Glen's physical abuse was corroborated by her mother, Katherine Ewell; the Saline county coroner, Wendell Lambert; her friend, Kelli Lambert, Wendell Lambert's daughter; her former friends, Julie and Merle Cozart; her friend, Marilyn Conwell; an acquaintance, Jonanna Lutwinski; and her psychologist, Dr. Michael Althoff.

The defendant, relying on evidence of battered woman's syndrome, contends that she was not proved guilty of second-degree murder beyond a reasonable doubt because her belief that she needed to

use deadly force was reasonable. The State replies that the evidence established defendant's guilt beyond a reasonable doubt. We agree with the State that the jury could have concluded from the evidence presented that the defendant did not act in self-defense.

The jury was instructed, *inter alia,* as follows:

> "A person commits the offense of first-degree murder when she kills an individual without lawful justification if, in performing the acts which caused the death,
>
> (1) she intends to kill or do great bodily harm to that individual or another; or
>
> (2) she knows that such acts will cause death to that individual or another; or
>
> (3) she knows that such acts create a strong probability of death or great bodily harm to that individual or another."

The court further instructed the jury that if each of the aforementioned propositions had been proved beyond a reasonable doubt, they should then determine whether a mitigating factor had been proved so that the defendant was guilty of the lesser offense of second-degree murder instead of first-degree murder. This is precisely what the controversy in this case centers on. The court told the jury that the defendant had the burden of proving by a preponderance of the evidence that a mitigating factor was present. The court instructed the jury that to find that the defendant was guilty of second-degree murder, it must be persuaded "that the defendant, at the time she performed the act which caused the death of Luther Glen Beasley, believed the circumstances to be such that they justified the deadly force she used, but her belief that such circumstances existed was unreasonable." See Ill. Rev. Stat. 1991, ch. 38, pars. 9–1, 9–2 (now 720 ILCS 5/9–1, 9–2 (West 1992)).

The relevant inquiry in this case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Campbell* (1992), 146 Ill. 2d 363, 374, 586 N.E.2d 1261, 1266; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) This standard gives the trier of fact the responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. (*Campbell,* 146 Ill. 2d at 375, 586 N.E.2d at 1266, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) Hence, the presumption is that the trier of fact resolved all controverted facts and questions of testimonial credibility in favor of the State. (*People v. Novy* (1992), 232 Ill. App. 3d 631,

663, 597 N.E.2d 273, 295.) We further note that the issue of self-defense is a question of fact to be decided by the jury. (*People v. Falconer* (1988), 168 Ill. App. 3d 618, 622, 522 N.E.2d 903, 906.) Hence, this court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses and will not reverse a criminal conviction or a determination on the issue of self-defense unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. See *Campbell*, 146 Ill. 2d at 375, 586 N.E.2d at 1266; *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 276; *People v. Cullen* (1992), 233 Ill. App. 3d 794, 800-01, 600 N.E.2d 14, 18.

■ In the case at bar, we believe that the evidence is sufficient to support the defendant's conviction for second-degree murder. A person is justified in using deadly force only if she reasonably believes that such force is necessary to prevent imminent death or great bodily harm. (Ill. Rev. Stat. 1991, ch. 38, par. 7—1 (now 720 ILCS 5/7—1 (West 1992)).) Here, we believe that the jury was justified in not believing defendant's theory of self-defense because it could have concluded that the defendant was not justified in using deadly force. According to Elwood's and Althoff's testimony, the victim was sleeping when he was killed even though he might have been beginning to awaken. Elwood testified that the defendant told him that she kissed Glen on the lips before she shot him. This testimony indicates that the defendant was not scurrying around to kill Glen before he had the opportunity to kill her. In fact, the evidence shows that even though Glen had abused the defendant in the past, the defendant might have been fearful that Glen had discovered that she was pregnant with Rice's child and killed him for that reason. Because the defendant shot Glen while he was asleep, the jury could have reasonably concluded that her conduct was not tantamount to self-defense but rather her conduct suggested that it might be retaliation or revenge for Glen's past abuse. See *Falconer*, 168 Ill. App. 3d at 623, 522 N.E.2d at 906.

Therefore, we believe that the jury's conclusion that the defendant's belief that she needed to use deadly force was unreasonable, despite the conclusion that she suffered from battered woman's syndrome, was supported by the evidence. Because the evidence of battered woman's syndrome was before the jury, as was evidence that defendant kissed the victim on the lips and shot him while he was sleeping, we decline to find that the jury's decision was unreasonable. Rather, we believe that the jury's decision, finding the defendant

guilty of second-degree murder because her belief in the need to use deadly force was unreasonable, was supported by sufficient evidence.

■ The defendant next asserts that the trial court erred in· dismissing two potential jurors *sua sponte*. The specifics of the dismissals were as follows. During *voir dire*, potential juror Brenda Harris told the court that her son had a criminal charge pending against him. On its own motion, the court excused Ms. Harris, and defense counsel objected. Defense counsel complained that the court had not determined whether Ms. Harris might be biased against the State. The State replied that it felt Ms. Harris might be prejudiced against the State because of her son's predicament. The trial court determined that its original ruling was appropriate. Potential juror Paulette Hale was also dismissed because her son had a pending felony charge against him. The court, on its own motion, excused Ms. Hale, and defense counsel objected for the same reasons as previously stated. The defendant now claims that she is entitled to a new trial because the court abused its discretion in dismissing Harris and Hale.

Initially, we believe that it is important to note that the Illinois Supreme Court has stated that, although the defendant is not entitled to the presence of a particular person on the jury, a defendant is entitled to be tried by an impartial jury. (*People v. Lobb* (1959), 17 Ill. 2d 287, 301, 161 N.E.2d 325, 333.) Because the defendant in the case at bar does not complain that the jury was composed of unfair or impartial members (see *People v. Phillips* (1981), 99 Ill. App. 3d 362, 368, 425 N.E.2d 1040, 1045), grounds for reversal do not exist. Even though we do not necessarily agree with the manner in which the trial judge dismissed the two potential jurors, we cannot say that the defendant was prejudiced by the trial judge's actions. We note, however, that the trial judge should not have *sua sponte* dismissed the potential jurors. In this case, the jurors were not statutorily disqualified (see Ill. Rev. Stat. 1991, ch. 78, par. 2). Even if they had been statutorily disqualified, we believe that the trial judge should have at least given counsel an opportunity to examine the potential jurors to determine whether they could serve impartially on the jury. Moreover, if a potential cause challenge exists or if a potential juror says that he cannot be fair, and neither counsel for the plaintiff nor the defendant makes the challenge, the judge should not *sua sponte* dismiss the potential juror. If the judge intends *sua sponte* to dismiss a juror for cause, the trial judge should call counsel to the bench and ask if either of them would like to make a cause challenge, rather than determining for himself that the potential juror should be disqualified. The judge is under no obligation to advise counsel of a potential cause

challenge, nor is he precluded from excusing a juror for cause even if counsel decline to make the challenge. Even though the judge should not have dismissed the two potential jurors *sua sponte*, the defendant's jury was composed of fair and impartial jurors, which is all that the defendant is entitled to have serve. (See *Phillips*, 99 Ill. App. 3d at 368, 425 N.E.2d at 1045.) Therefore, this court will not reverse the defendant's conviction. Furthermore, we note that the State could have used its remaining peremptory challenges to strike Harris and Hale from the jury.

■ Finally, the defendant contends that the court erred in sentencing her to eight years in prison. The State argues that, according to *People v. Macke* (1992), 224 Ill. App. 3d 815, 587 N.E.2d 1113, the defendant is precluded from raising this issue for the first time on appeal because the defendant failed to file a motion challenging her sentence in the trial court. We agree with the State and believe that the defendant has waived this issue. (See *People v. Jenkins* (1993), 251 Ill. App. 3d 1, 4.) However, if the defendant had not waived this issue, the defendant's claim that her sentence of eight years' imprisonment is excessive and should be reduced to the minimum four-year term is without merit. To support her argument, the defendant focuses on the fact that she was a battered woman, she has an insignificant criminal history (one speeding ticket), and she has three young children, two with serious illnesses and limited life expectancies that are totally dependent upon her for their care.

Because the imposition of a sentence is a matter of judicial discretion, the sentence of the trial court will not be altered on review absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.) The defendant was convicted of second-degree murder, a Class 1 felony. (See Ill. Rev. Stat. 1991, ch. 38, par. 9—2(d) (now 720 ILCS 5/9—2(d) (West 1992)).) The sentence of imprisonment for a Class 1 felony is not less than four years and not more than 15 years. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(4) (now 730 ILCS 5/5—8—1(a)(4) (West 1992)).) The defendant's eight-year sentence is within the sentencing range. Further, a review of the record demonstrates that the trial judge specifically stated the factors that he relied upon when he sentenced the defendant. In fact, the trial judge commented several times that the defendant was an abused woman. The court stated that the victim was asleep or beginning to awaken when the defendant shot him, which was not a confrontational situation. Further, the court noted that after Rice took the gun to the defendant's house, she called him at a later time for instructions on the operation of the gun. Moreover, the court recog-

nized that the defendant attempted to establish an alibi and only confessed to the murder when the police confronted her with further evidence. The court also commented that it was cognizant of the fact that the defendant had two seriously ill children, and the court stated: "There is no one in this courtroom more aware of that fact than me or more concerned about that issue." The trial judge, in announcing the defendant's sentence, stated as follows: "[P]robation would deprecate the seriousness of your conduct and would be inconsistent with the ends of justice; particularly taking into account the method and manner in which the death occurred and the fact that your conduct did cause or threaten serious physical harm to another. However, in deference to the fact that you were the victim of abuse, again, to what extent we will never know, I will not impose the maximum sentence in this case." Hence, we believe that the trial judge, who heard all of the evidence and observed the defendant at trial, did not abuse his discretion when he sentenced the defendant to an eight-year term of imprisonment. See *Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.

For the aforementioned reasons, the judgment of the circuit court is affirmed.

Affirmed.

WELCH, J. concurs.

JUSTICE CHAPMAN, specially concurring:

I write separately because I do not agree with the majority's statement that the sentencing issue was waived by defendant's failure to file a motion challenging her sentence in the trial court. (See *People v. Jenkins* (1993), 251 Ill. App. 3d 1 (Chapman, J., specially concurring).) I agree, however, with the majority's conclusion that the sentencing issue is without merit.