THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BERLIN JENKINS, Defendant-Appellant.

First District (5th Division)    No. 79-693

Opinion filed September 19, 1980.

James J. Doherty, Public Defender, of Chicago (Rank R. Rago, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Barry S. Pechter, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of attempted murder (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1, 8—4), aggravated battery, (Ill. Rev. Stat. 1977, ch. 38, par. 12—4(a)), armed violence (Ill. Rev. Stat. 1977, ch. 38, par. 33A—2), and armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2). He was sentenced to concurrent 50-year terms for the offenses of armed robbery and attempted murder. On appeal he contends: (1) that he was not proved guilty beyond a reasonable doubt; and (2) that by deliberately

withholding information during jury selection that the victim's testimony would be taken in a hospital, the prosecution violated defendant's right to a fair and impartial jury. We affirm. The pertinent evidence follows:

The complainant, John Richardson, Jr., testified that on May 26, 1978, he was in the company of defendant at 4 a.m., in defendant's house. He slept for a few hours, awakening at approximately 9 a.m. Defendant's mother, Doris Jenkins, wanted Richardson to accompany her son while he paid certain bills. She gave defendant a telephone bill and money to pay it. She gave Richardson approximately $200, along with a gas and light bill.

Richardson testified that he and defendant left the Jenkins' home at approximately 9:30 a.m. Defendant said that he planned to make a stop in Harvey because he had some marijuana plants to check on. Defendant stopped the car in a wooded area somewhere in Harvey at approximately 10 a.m., and the two men left the car. Defendant showed Richardson a .25-caliber automatic weapon. After inspecting it, Richardson returned the gun to defendant. Richardson began to walk down a path and was then shot in the back. He turned around and looked at defendant, who continued firing at him. Defendant said to Richardson, "Stop messing with my woman." Richardson fell to the ground, still looking at the defendant. Defendant then removed Richardson's wallet and dragged him into a creek or river. Defendant left, but returned when Richardson began yelling for help. Defendant told him to stop yelling or he would blow his head off. After defendant left, two men discovered Richardson and went for help. He then lost consciousness.

Richardson further testified that on the day of the shooting he did not tell anyone who shot him, but on the following day he told an assistant State's Attorney that the defendant was his assailant.

On cross-examination, Richardson testified that he had drifted in and out of consciousness after being shot. He further stated that it had taken no more than 20 to 30 minutes to reach the wooded area from defendant's house. Finally, Richardson denied that he told a nurse at the hospital that "they" shot and robbed him.

According to defendant's testimony, Richardson arrived at his house on May 26, 1978, at 3:30 a.m. The two men had known each other for two years. Defendant smelled alcohol on Richardson's breath. Richardson told defendant that he "need[ed] a pistol bad" and that Alvin Bosby kicked him out of the Bosbys' home. He also said things were not going right for him and suggested, "Let's get high."

Defendant further testified that his mother gave him $130 to pay the telephone bill and gave Richardson about $122 to pay the gas and light bill. The two men left between 9 a.m. and 9:30 a.m. They drove to Roseland Plaza area, around 115th Street and Michigan Avenue, where they parked. Friends of Richardson approached him and he walked off with them

toward the currency exchange building, while defendant went to pay the phone bill.

Defendant testified that he filled out an application to pay the lost bill, gave the clerk $130 and received a stamped receipt from the clerk. After looking at the telephones for awhile, defendant left the building to rejoin Richardson at the car. Richardson was not there so defendant looked in several stores but failed to find him. He then drove home.

Defendant arrived home at approximately 10:30 a.m. Ralph Lawson, Irma Reed, and defendant's mother were there. Lawson accompanied defendant to the shopping center area in an attempt to find Richardson. They also went to the Bosby home, but failed to find Richardson. Defendant returned home and, learning that police had come to his home, told his mother to call the police.

On cross-examination, defendant testified that he first learned of Richardson's shooting on May 27, 1978, when he was arrested. Defendant later stated that he knew the victim was shot on May 26, 1978, when Richardson's father informed defendant's mother. Defendant further testified that the drive from his house to the Illinois Bell Telephone office took 12 minutes. He estimated that he arrived at the shopping center at approximately 9:40 to 9:45 a.m. on the day of the incident and paid the phone bill at about 10 a.m. Defendant also testified that both he and Richardson had dated Joanne Bosby.

A nurse at the hospital where Richardson was taken after the shooting testified that when she asked him who shot him he at first did not respond but when she repeated the question fifteen minutes later, he replied that "they" shot and robbed him. During this time Richardson was receiving emergency treatment.

Employees of Illinois Bell Telephone testified as to the payment card that a teller filled out on May 26, 1978. The identity of the customer was not indicated on the card, but the amount indicated thereupon was $130. The teller who handled the card estimated, through transaction numbers, that she handled the payment in question "a little before ten or a little after ten," although she stated under cross-examination that the bill could have been paid as late as 10:20 a.m.

Alvin Bosby testified that on May 25, 1978, Richardson spent part of the night at his home. Richardson began cursing at Alvin's sister, Joanne, until Alvin ordered Richardson to leave. Bosby also stated that neither Richardson nor defendant was dating Joanne at that time.

Opinion

Defendant contends that complainant's version of the incident is so bizarre and contradictory as to require reversal of defendant's conviction, especially in light of his alibi. We do not agree. It is the jury's role to

determine the truth when the evidence conflicts. While a conviction, to be sustained, "must rest on the strength of the People's case and not on the weakness of the defendant's case" (*People v. Coulson* (1958), 13 Ill. 2d 290, 296, 149 N.E.2d 96, 99), the conviction may be based solely on the credible testimony of the complaining witness. *People v. Mays* (1979), 74 Ill. App. 3d 145, 154, 392 N.E.2d 106, 114.

Defendant's main objection to the credibility of complainant's testimony is that it is illogical and fails to overcome defendant's witnesses' testimony and business record evidence. According to defendant, it is highly implausible that defendant would hand Richardson the gun for inspection, then shoot him several times, returning long enough to merely threaten Richardson with death if he continued calling for help. Further, defendant emphasizes, Richardson never denied saying to defendant that he "needed a gun bad." Also, the nurse who questioned Richardson in the hospital's emergency room testified that he said "they" shot and robbed him, thereby indicating that more than one person was present during the shooting. With regard to motive, defendant argues, none was effectively established because Joanne Bosby was not his girlfriend and he would have no reason to say, "Stop messing with my woman."

In contrast to these purported weaknesses in the State's case, defendant contends that his version of the May 26 incident is supported by Illinois Bell Telephone's business records as well as defendant's credible witnesses. A careful review of the record in this case reveals adequate support for the jury's verdict. Inferences may be drawn from complainant's testimony that are wholly consistent with defendant's guilt. Thus, for example, defendant's handing the gun to Richardson prior to the shooting may be explained as a ploy to put the intended victim off guard, to minimize resistance. Similarly, defendant's seemingly odd threat to blow off Richardson's head if he did not keep quiet, made after defendant had already shot Richardson several times, could be explained by the simple possibility that defendant ran out of bullets. The jury decided who to believe and drew their own inferences from the evidence.

■■■ Defendant's alibi does not compel an opposite result. The Illinois Bell payment card and defendant's receipt only indicate that someone paid the Jenkins' telephone bill on the morning of May 26, 1978. Hence, the presumption that defendant was present at the Illinois Bell office sometime during the morning, "before or after 10:00 a.m., " may not be considered persuasive evidence that he would not have had time to shoot Richardson on that morning. In fact, the State's evidence tended to establish that defendant had sufficient time to commit the crime, even using the time periods most favorable to defendant. Regarding the testimony of defendant's witnesses, it may be true that it verified portions of defendant's alibi. Significantly, however, no one was with defendant at all times during the

morning of May 26. In viewing all the evidence, we note that the jury was clearly not obligated to believe defendant's alibi evidence. (*People v. Clark* (1972), 52 Ill. 2d 374, 387, 288 N.E.2d 363, 370.) The jury must judge the credibility of the witnesses and the reviewing court will not reverse the verdict unless the evidence is "so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt." (*People v. Coulson* (1958), 13 Ill. 2d 290, 296, 149 N.E.2d 96, 99.) We conclude that defendant's conviction is amply supported by the evidence in this case.

Defendant next questions the propriety of allowing Richardson to testify in the hospital instead of the Harvey courtroom. He contends that he was deprived of the right to a fair and impartial jury because of the prosecution's deliberate concealment, during the voir dire, of information bearing on the necessity for the transfer.

The circumstances relevant to this issue are as follows: The voir dire examination began December 4, 1978, and concluded on December 5. On the evening of the 4th, the assistant State's Attorney telephoned Richardson, who was in Mercy Hospital, regarding his availability to testify on Wednesday December 6. Richardson replied that he thought he would undergo plastic surgery on December 6. At about 10:30 a.m. on December 5, the assistant State's Attorney spoke with Dr. Shah, who stated that he believed that the operation would take place on the 6th. Later that day the assistant State's Attorney learned that the operation was in fact scheduled for Thursday, December 7.

On December 5, 1978, the State moved the court to transfer the trial to Mercy Hospital for Richardson's testimony. The State had an order dated December 5, signed by Chief Judge Comerford, which designated Mercy Hospital as a courtroom facility. The actual decision to transfer the trial to Mercy Hospital rested in the discretion of the trial judge; the chief judge's order did not itself operate as an order to transfer.

The reason for the State's motion was to accommodate Richardson, who was scheduled to have skin grafted on his feet because of burns he sustained while at the hospital. This injury was not directly related to the injuries he had sustained during the May 26 shooting. The trial court granted the State's motion to transfer. The next day, however, (December 6, 1978), the court heard defense's motion for reconsideration and vacated the transfer order. Following a hearing on the motion that involved two medical witnesses, the trial court again granted the motion to transfer. The court further denied the defense's motions for a mistrial and for reopening the voir dire.

After the judge admonished the jury to disregard the fact that Richardson was in a hospital and could not come to the Harvey courtroom because of a physical condition unrelated to the case, the jury heard Richardson's testimony in Mercy Hospital's auditorium.

It is defendant's theory that during the voir dire the prosecution obtained knowledge of Richardson's upcoming surgery and, without notifying the defense, acquired the chief judge's order designating Mercy Hospital as a courtroom. Had defendant known of this development, he argues, he would have interrogated the prospective jurors regarding possible sympathies or emotions that might be triggered by hearing Richardson's testimony in a hospital setting. Apparently, the defendant did not know of the possibility of the transfer until after the jury was impanelled. Because of the possibility of the hospital's prejudicial effect on the jurors and his inability to question them about that, defendant argues, his constitutional right to a fair and impartial trial was circumvented.

The State, on the other hand, argues that the defendant waived the right to object to issues relating to the voir dire because the parties stipulated that the voir dire would not be recorded. Without a record of the voir dire, of course, the reviewing court cannot review the proceedings. Secondly, the State argues that even if the issue is not waived on appeal, the defendant had ample opportunity to determine essential juror qualifications and to ask questions relating to the victim's condition and the fact that he was confined to a hospital. Regarding the actual transfer, the State contends that the defendant suffered no undue prejudice because of the trial court's ample precautions and the fact that the Mercy Hospital auditorium was set up to simulate a courtroom.

We agree with the State that no harm to defendant resulted from the trial court's granting of the motion to transfer. We also believe that there is insufficient evidence of wrongful concealment on the part of the State. With regard to the waiver issue, however, we disagree that defendant is precluded from raising this particular objection. As a general principle, the parties' stipulation that the voir dire examination not be recorded precludes the subsequent raising of voir dire issues on appeal for the logical reason that the appellate court cannot review specific questions and answers where there is no record. (*People v. Turner* (1976), 35 Ill. App. 3d 550, 572, 342 N.E.2d 158, 173-74.) In this case, however, defendant does not request review of particular questions and answers asked of the prospective jurors; rather, defendant objects to what he perceives as the prosecution's deliberate attempt to circumvent his opportunity to question the jurors as to a particular matter that only the prosecution had knowledge of at the time of the voir dire. If this were true, we cannot say that defendant's waiver extended so far. Because we find defendant's assertion of prosecutorial misconduct to be without merit, however, it is unnecessary to pursue the waiver issue further.

At the root of defendant's charges of prosecutorial misconduct is the fact that the assistant State's Attorney, without notifying the defense, obtained from the chief judge the special order designating Mercy Hospital

as a courtroom facility. The assistant State's Attorney knew of Richardson's upcoming surgery on the evening of December 4. At that time the designation order was acquired, on December 5, the examination of prospective jurors was in progress. The voir dire was concluded the same day, after which the State presented the special order and moved the court to transfer the trial to Mercy Hospital for Richardson's testimony. We do not believe that the fact the State made the motion to transfer after the jury was impanelled and without prior notice of the chief judge's order amounts to prejudicial conduct. The earliest the assistant State's Attorney learned of the victim's scheduled surgery was the evening of December 4. The special order was obtained on the morning of the 5th, presumably as a means to facilitate the State's subsequent motion to transfer the proceedings to Mercy Hospital. There are no authorities cited to suggest that the prosecution had an affirmative obligation to inform the defense of the surgery *before* it made the motion to transfer. Certainly the record does not reveal anything amounting to intentional misconduct or a conspiracy to conceal material information. Moreover, at the time defendant learned of the motion, he requested the court, unsuccessfully, to reopen the voir dire or to declare a mistrial. He does not now directly challenge the trial court's discretionary rulings on those issues. Apparently, then, the defendant's real objective is to challenge the fairness of the transfer itself.

We find, and indeed the defense effectively conceded during oral argument, that the trial court's final ruling on the transfer motion was carefully considered. Initially, the court granted the State's motion without hearing testimony on the medical necessity of the transfer.[1] Subsequently, upon defendant's motion for reconsideration, the court vacated its order and heard testimony regarding Richardson's physical condition and feasibility of moving him to the Harvey courtroom. Two of the witnesses were doctors, both of whom recommended that Richardson not be moved, because of the possibility of disturbing the newly grafted skin on his feet and the possibility of infection. The record further shows that the judge took several precautions to avoid any undue prejudice to defendant that might result from the hospital setting. The hospital room itself was an auditorium set up to resemble an actual courtroom. Jurors entered from a special elevator that went directly to the auditorium and thus they were not exposed to other hospital rooms. The only possible prejudicial effect was that the jurors knew they were physically present in a hospital. Finally, the

---

[1] It is probably true, as defendant argues, that the trial judge gave at least some weight to the chief judge's order designating Mercy Hospital as a place for holding court. The designation order, however, may be characterized as a general administrative order that merely granted permission to use the hospital facility and did not purport to usurp the trial judge's discretionary powers to grant or deny the motion to transfer.

judge carefully admonished the jury regarding the procedure, both before and after the victim's testimony. He stated:

> "And again I repeat, * * * despite the fact that you're in a hospital, the circumstances and the conditions under which you heard this testimony has no bearing on the testimony, nor is the fact that Mr. Richardson is presently incapacitated by plastic surgery to his feet in any way related to the incidents about which [he has testified]."

■■ We believe that the trial court observed the highest standard to safeguard defendant's rights in these circumstances. It is clear that, in light of the above, defendant's objection is tenuous at best and involves only the speculative possibility that, had defendant previously known of the transfer, he could have asked the jurors specific questions regarding the hospital setting. We do not know, of course, what questions were asked during the voir dire. We note, however, that at the time of defendant's motion to reconsider the transfer order, the jury knew of Richardson's injuries and that he was at Mercy Hospital. Moreover, it is logical to assume that the defense had adequate opportunity to thoroughly question prospective jurors regarding any biases or sympathies they might have because of Richardson's physical condition, including his confinement in the hospital. Finally, in view of the trial court's safeguards and the fact that the hospital auditorium resembled an actual courtroom, we do not believe the mere additional fact that the jurors knew they were in a hospital is prejudicial to defendant. When a voir dire examination results in a qualified and impartial jury, there occurs no prejudicial error in its selection. (*People v. Carruthers* (1974), 18 Ill. App. 3d 255, 261, 309 N.E.2d 659, 664.) We therefore affirm defendant's conviction.

■■ With respect to defendant's request for a reduction in his sentence, we note that sentencing is a matter of the trial court's discretion and may not be altered upon review absent an abuse of that discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 156, 368 N.E.2d 882, 883.) Despite defendant's youth and the considerable length of the sentence, we cannot say there is any showing of substantial reasons for reducing the sentence (*People v. Frazier* (1977), 53 Ill. App. 3d 884, 369 N.E.2d 398), or that it is manifestly excessive.

Affirmed.

LORENZ and MEJDA, JJ., concur.