THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LESTER ZEISLER, Defendant-Appellant.

Third District   No. 81—750

Opinion filed February 17, 1983.—Opinion modified March 16, 1983.

STOUDER, J., dissenting.

Robert Agostinelli and Verlin R. F. Meinz, both of State Appellate Defender's Office, of Ottawa, for appellant.

John R. Clerkin, State's Attorney, of Macomb (John X. Breslin and Kenneth A. Wilhelm, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

This matter involves a fire at the Zeisler residence which left Betty Zeisler severely burned over three-quarters of her body. As a result, Betty's husband, Lester Zeisler, was charged by information with two offenses: (1) attempt murder (Ill. Rev. Stat. 1979, ch. 38, pars. 8—4(a), 9—1(a)(1)); and (2) aggravated arson (Ill. Rev. Stat. 1979, ch. 38, par. 20—1.1). Following a jury trial, Lester Zeisler was acquitted of attempt murder but convicted of aggravated arson. The trial court sentenced him to a term of 30 years of imprisonment. Mr. Zeisler now appeals.

In addition to other pretrial motions, Zeisler filed a motion to suppress the results of the arson investigation conducted by Deputy Fire Marshal Hollis Miller. The motion alleged that Miller illegally searched Zeisler's property initially without a warrant and that the search warrant he ultimately secured was based on information obtained during the prior illegal search. After a hearing on the motion, the trial court denied Zeisler's motion and refused to suppress the evidence. The

trial court found the search reasonable and cited an Illinois statute which provided for investigation of fires for cause determination by municipality fire chiefs and the State Fire Marshal.

A jury trial was held on October 26 through October 30, 1981. During the first two days, the State put on 18 witnesses.

Evidence adduced by the State at the trial established that on the afternoon and evening of June 30, 1981, Lester Zeisler and his wife, Betty, were patrons of several local taverns. At times they were together, but generally they drank with separate groups of persons at different places. At around 10:30 p.m., Betty Zeisler came into Larry's Longshot tavern in Bushnell and socialized until approximately midnight when the tavern closed. Lester Zeisler was not with her at the tavern between 10:30 p.m. and midnight. In the bartender's opinion, Betty was not intoxicated when she left the tavern alone at midnight. Around 12:30 a.m., several neighbors observed smoke coming from the second floor of the Zeisler apartment. The neighbors called the fire department. Although the neighbors knocked loudly on the door to the apartment, no one responded although they heard a noise like a "thud" from the inside. The neighbors then tried to enter the apartment but found the door locked.

The police and fire department arrived shortly thereafter. Earl Niestradt, fire chief of Bushnell, testified that when he arrived at the Zeisler apartment around 12:30 a.m., firemen were already on the scene. Niestradt entered the fire-filled apartment and removed the badly burned body of Betty Zeisler. It took approximately 20 minutes to get the major portion of the fire under control. The firemen then waited until the smoke cleared before fighting the rest of the fire. Towards the end of the fire fight, but before the fire was out, Niestradt examined the premises to determine the cause and origin of the fire. After deciding that he was not able to determine the cause and origin, he decided to call the Deputy State Fire Marshal for assistance in the morning.

The police and firemen remained at the Zeisler apartment and, at around 1:45 a.m., Lester Zeisler returned home. A policeman on the scene informed Zeisler that his wife, Betty, had been hurt fairly badly. The policeman reported that Zeisler, who was "cocky and drunk," snickered and said, "Oh, really."

In the interim, Betty Zeisler was taken to the McDonough District Hospital. She arrived in the emergency room around 1:45 a.m. According to the attending physician, Mrs. Zeisler had severe burns over 80% of her body and was in great pain and in shock. Emergency procedures were undertaken. Because of her condition, Mrs. Zeisler was

transferred to the Springfield Burn Center in Springfield, Illinois.

Fire chief Niestradt telephoned Lewis Ellis, the Deputy Fire Marshal from Good Hope at about 6:30 a.m. that morning, July 1, 1981. Niestradt told him of the Zeisler fire earlier that morning, that he was unable to determine the cause and origin of the fire and would like to have some help. Ellis told Niestradt that a fire investigator would arrive to assist with the investigation around noon. Niestradt testified that he did not suspect arson at the time he called Ellis.

State Fire Investigator Hollis Miller arrived at Niestradt's office at noon and both left immediately for the fire-destroyed Zeisler residence. There they walked around the outside of the premises. Upon Miller's suggestion, they drove 16 miles to the State's Attorney's Office in Macomb, Illinois, to get a search warrant. They were told that no search warrant was needed so they then returned to the Zeisler residence in Bushnell. They then entered the premises for the purpose of determining the cause and origin of the fire. Miller took some photographs and cleared away some debris on the kitchen floor. Miller observed definite pour and burn patterns in the kitchen. In Miller's opinion, these were clear evidence that the fire was incendiary or man-made in origin. They clearly rebuffed any notion that the fire was accidental. Accordingly, Miller believed a search warrant was needed to search for accelerants, accelerant containers and other evidence of aggravated arson. Both men proceeded to Macomb and obtained a search warrant. Upon returning to Bushnell, Miller took more photographs, removed tile in the kitchen and front room, and examined the kitchen area, the furnace, the washer and dryer.

The foregoing testimony from the State's witnesses was adduced on the first two days of trial. On the third day of trial, the court convened at the auditorium of the Memorial Medical Center in Springfield, Illinois, to hear the testimony of Betty Zeisler. At that time she was still a patient at the hospital, recovering from injuries sustained in the fire.

The State had previously filed a motion to take the extraterritorial testimony of Betty Zeisler in Springfield. Mr. Zeisler vigorously objected to the State's motion. A hearing on the motion was held. Betty Zeisler's physician testified that she had been burned over 75% of her body, had endured repeated skin grafts and had 10 digital amputations. In the doctor's opinion, transporting Mrs. Zeisler 85 miles from Springfield to Macomb for the trial would be detrimental to the healing process although it would not be life-threatening. At the conclusion of the testimony and argument of both sides, the trial court granted the State's motion.

Accordingly, the jurors were taken by bus to Springfield to listen to the testimony of Betty Zeisler. The proceedings took place at the Memorial Medical Center in a recreation therapy room measuring 1,000 square feet. An area was specifically set aside in the room for the public and press.

Mrs. Zeisler testified that on the day preceding the fire she and her husband, Lester Zeisler, went to a local gasoline station and purchased some gasoline in a can. Mr. Zeisler wanted the gasoline to mow his mother's yard. Although he did not mow the grass that day, Mrs. Zeisler is unsure what her husband did with the gasoline can. Mrs. Zeisler went to Larry's Longshot tavern that evening from about 10 p.m. to 11:45 p.m. She then walked home and dozed off on the couch in the living room. Lester came home a little later and wanted something to eat. He then picked up a skillet, tried to hit her with it, then threw it on the floor. Zeisler then hit his wife with his fist, knocking her to the floor. The next thing Mrs. Zeisler remembers is having fire all around her. She recalls her body on fire. Her husband Lester stood over her and said, "Burn, bitch, burn." Lester then dragged her into the living room and locked the door as he left the apartment.

On cross-examination, Mrs. Zeisler admitted that she had been in and out of bars during the afternoon preceding the fire on June 30. She had an argument with Lester that afternoon, asked him for a divorce and ran away from him. Mrs. Zeisler was upset with Lester because of his seeing Peggy Wishon, who was the wife of her brother Earl. She did not think that she was drunk when she walked home from the tavern around midnight that night. Peggy Wishon and Peggy's mother, Delores Rosenberry, were with Lester when the fire started in the apartment.

The State rested at the conclusion of Mrs. Zeisler's testimony. The defense countered with a variety of witnesses presenting essentially alibi testimony. Not germane to this appeal, we find further elaboration unnecessary.

Among the motions filed by Zeisler prior to trial was one seeking to suppress the results of the fire investigation conducted by Deputy Fire Marshal Hollis Miller. Zeisler claims that Miller illegally searched his apartment without a warrant and that Miller then searched it again with a warrant secured with information derived from the first search. The trial court denied Zeisler's motion to suppress the evidence from Miller's investigation. Zeisler claims this as error. We do not agree.

Fire officials are charged not only with extinguishing fires, but

with finding their causes. According to Illinois law:

> "The chief of the fire department of every city or village in which a fire department is established *** shall investigate the cause, origin and circumstances of every fire occurring in such city *** by which property has been destroyed or damaged, and shall especially make investigation as to whether such fire was the result of carelessness or design. Such investigation shall be begun within two days of the occurrence of the fire ***." (Ill. Rev. Stat. 1979, ch. 127½, par. 6.)

The United States Supreme Court has held the contention that the need to obtain a warrant begins with the dousing of the last flame is "unrealistically narrow." (*Michigan v. Tyler* (1978), 436 U.S. 499, 56 L. Ed. 2d 486, 98 S. Ct. 1942.) In *Tyler*, the court went on to find that the cessation at 4 a.m. of the promptly begun investigation due to the hindrances caused by darkness and the subsequent continuation of it later in the morning was no more than an "actual continuation" of the first investigation. The court held that the investigation was done in a reasonable time and did not require a warrant.

The instant facts are similar. Fire chief Niestradt began his investigation into the Zeisler fire after the blaze was brought under control. After deciding that he was unable to determine the fire's cause and origin, he decided to call the Deputy Fire Marshal. Niestradt did this promptly at 6:30 a.m. that morning. At that time Niestradt was told a fire inspector would be out to assist him around noon. When Deputy Fire Marshal Miller arrived in Bushnell around noon, Miller and Niestradt entered the apartment to determine the cause and origin of the fire. We do not find this search of the Zeisler apartment so detached from the initial investigation activities of the fire chief so as to require a search warrant. We note that the fire occurred after midnight. The town of Bushnell is small in population with no fire marshal or investigator readily available. We note also that Bushnell fire chief Niestradt was fully employed as manager of a grain elevator. As Bushnell is not a large metropolis, we can assume Niestradt's activities as fire chief are limited. We believe it reasonable that he called in a fire investigation professional with as much dispatch as possible given the circumstances. For Niestradt to suspend his investigation for several hours until the arrival of an expert is like postponing the search until the smoke clears or the proper tools become available. Thus the evidence of arson gathered during the Miller-Niestradt investigation was proper; the evidence was found during a continuation of the prompt investigation of the cause of the fire.

■ It is important for us to note at this juncture that it is clear

from the record Niestradt did not suspect arson when he called the Deputy Fire Marshal for assistance. Had Niestradt suspected arson and his purpose for visiting the Zeisler apartment with Miller was for gathering evidence of arson, then their conduct might well have exceeded the bounds of the fourth amendment if they did not have a warrant. But such is not the case. It wasn't until Miller came across the pour and burn patterns during his first visit that arson was suspected; a warrant was then immediately sought and obtained.

While search warrants are always preferred, we recognize that practicality demands some flexing. To hold that fire investigators relinquish their authority to search without a warrant for the cause of the fire once they depart from the dwelling for any reason, is impractical and unreasonable. Such is not required by the law. The trial court, after hearing the evidence and argument of counsel, held that the warrantless fire investigation by Miller was reasonable and the evidence of arson therein obtained was admissible. We will not disturb the trial court's ruling on a motion to suppress unless it is manifestly erroneous. (*People v. Williams* (1974), 57 Ill. 2d 239, 246.) We cannot say, from the evidence presented, that the trial court's ruling on the motion to suppress was manifestly erroneous.

■ As his second claim of error, Zeisler contends that the trial court's decision to permit the jurors to witness the testimony of the victim, Mrs. Zeisler, at the hospital was error which requires reversal of his conviction. We do not agree.

The defendant contends that a court is powerless to act in any place other than the courtroom designated by law. In support of this contention, defendant cites two statutes, neither of which apply to this case.

The first statute provides that a criminal action must be tried in the county where the offense was committed. (Ill. Rev. Stat. 1979, ch. 38, par. 1—6(a).) This is a venue statute. No one is asserting that venue has been set in Sangamon County rather than McDonough County where the offense occurred. The sole purpose of the trip to Springfield was to allow the jury to hear the testimony of a witness and nothing more. For all other purposes the trial was held in McDonough County.

The second statute provides for the establishment of a temporary courthouse in the event of a national emergency or public calamity. (Ill. Rev. Stat. 1979, ch. 37, par. 72.34.) This statute obviously contemplates the necessity of re-establishing the situs of a courthouse and has nothing to do with regulating the proceedings within an individual trial.

Defendant also cites two rather old supreme court decisions which held that a court can exercise its functions only in the places appointed by law. (*People v. McWeeney* (1913), 259 Ill. 161; *McCune v. Reynolds* (1919), 288 Ill. 188.) We feel that these cases are of limited scope today in light of the fact that a court may, in its discretion, permit a jury to view evidence outside of the courtroom. In a similar manner, we do not construe those cases as preventing a judge from exercising his discretion, in limited circumstances, to permit a jury to hear the testimony of a witness outside of the courtroom. The judge controls the conduct of trial and should be given broad discretion in doing so. *People v. Beil* (1979), 76 Ill. App. 3d 924.

In the instant case, the testimony of Mrs. Zeisler was important. She was the victim of the alleged crimes. In the hearing on the motion, her physician testified that it would be quite stressful for her to travel from the hospital to Macomb to testify in the trial. At the time of trial she still had a tube in her neck for breathing purposes. Moreover, the trip would have retarded her tenuous burn healing process.

We are cognizant that the trip would not have threatened the life of Mrs. Zeisler. We are also well aware that the supreme court rules provide for introduction into evidence of the deposition of a witness unable to attend a trial. (73 Ill. 2d Rules 212, 414.) These facts alone, however, do not support the claim that the trial court abused its discretion without some showing that the defendant was prejudiced when the jury was allowed to hear Mrs. Zeisler's testimony outside the courtroom.

The defendant argues that he was prejudiced because taking the testimony of a witness in a hospital somehow denigrates the dignity and decorum of the proceedings and gives undue emphasis to the testimony of that witness. We believe that the court carefully controlled the conduct of the proceedings and established adequate safeguards to prevent any overemphasis. Upon informing the jury that they would hear testimony at the hospital, the judge made the following statement:

> "You will be accompanied in your transporting by the bailiffs only and, of course, a driver person.
>
> *** We will take testimony, and the place in which we take it will be a public place and will be used at that place as a court facility very temporarily.
>
> During your travel to and from Springfield, it would be the direction of the Court, and the bailiffs would see to it, that, of course, you not discuss the case, not discuss your reason for

going to Springfield, nor discuss the testimony that you hear in Springfield. In other words, you will treat tomorrow as just another day in court for the purpose of considering evidence with respect to this matter.

I would ask and direct that you not take any reading material that would contain any information regarding this trial, and I would further direct that the mere fact that we are not holding court in this room tomorrow should not be considered by you in any way.

You should not be biased or prejudiced against the Defendant or the People. In other words, it should be considered as just another day in Court.

I would estimate that you will be back early in the afternoon, reasonably early in the afternoon. You will be provided with the necessary meals and provisions will be made for public spectators as necessary.

With that I, of course, would admonish you again not to read anything about this case, listen to anything on the radio, talk about it either among yourselves or to members of your family; and with that see you tomorrow. Good night."

It is apparent that the judge was stressing the fact that the proceeding should be considered just another day in court. The testimony was heard in a 1,000-square-foot hospital facility which was sufficient to accommodate the persons necessary on the proceeding and the interested public. There is no evidence that dignity and decorum were in any way denigrated by this procedure. The mere fact that the jury knew they were in a hospital, in view of the court's safeguards, does not demonstrate any prejudice to the defendant. *People v. Jenkins* (1980), 88 Ill. App. 3d 719.

Under the circumstances of this case, we find that the trial court acted properly in granting the State's motion to hear the testimony of Mrs. Zeisler outside the courtroom. Accordingly, we affirm the judgment.

Affirmed.

ALLOY, J., concurs.

JUSTICE STOUDER, dissenting:
I respectfully disagree with my colleagues as to the issue of

whether it was error to permit the jurors to witness the testimony of the victim at the hospital. I believe that it was reversible error to do so.

The Illinois Supreme Court has stated that courts are not migratory and can only exercise their functions in the places appointed by law (*People v. McWeeney* (1913), 259 Ill. 161, 102 N.E. 233), and Illinois law clearly contemplates that legal proceedings will be held in county courthouses. Ill. Rev. Stat. 1981, ch. 37, pars. 72.33, 72.34.

Furthermore, in *McCune v. Reynolds* (1918), 288 Ill. 188, 123 N.E. 317, a will contest action, the court indicated it was error to allow the removal of the trial court to the home of a witness to the will for the purpose of taking his testimony, he being ill and unable to attend the proceedings. However, because the witness' testimony was not essential in establishing a *prima facie* case of the lack of testimentary capacity or undue influence and the taking of the testimony at his home was agreed upon by the parties, such error was a harmless one. See *People v. Jenkins* (1980), 88 Ill. App. 3d 719, 419 N.E.2d 1125, for a contrary view; the court holding that it was not error to remove the trial court to a hospital to hear the victim's testimony, the only error considered being the claim of defense counsel that he was deprived of an opportunity to *voir dire* the jury on any bias they might have about removal of the court to a hospital setting.

The law in this area among the other States does not clearly establish the propriety or impropriety of hearing a witness' testimony outside of a courthouse. (Annot., 18 A.L.R.3d 572 (1968).) However, it appears in most cases holding that no error results, specific mention is made of either an agreement between the parties to hear a witness' testimony outside of the courtroom, the fact that no statute exist which prohibits the holding of court outside of the courthouse or the fact that testimony was heard at a view in order to explain what was being seen by the jurors. Conversely, in those cases holding that error does result in hearing a witness' testimony outside of the courthouse, the decisions appear to be based upon jurisdictional grounds: holding court anywhere other than the legally designated place is not authorized by law and is therefore void.

As stated previously, Illinois statutory law contemplates that legal proceedings will be held in courthouses. Of probably even greater importance as applied to the circumstances of this case, is Supreme Court Rule 414(a) (73 Ill. 2d R. 414(a)), which provides for evidence depositions of witnesses who may be unavailable to testify in criminal cases. This rule specifically applies to the circumstances of the victim in this case and her apparent inability to testify at the trial. Granted

the trial judge has discretion in the conduct of the trial, the discretion is exercisable in the context of guiding principles and rules and is limited by the applicable principles and rules. Neither the trial court nor the majority of this court suggest any reasons why Supreme Court Rule 414(a) was inapplicable or in any way suggest how or why the circumstances did not fall within its scope. Where there is as in the present case, a supreme court rule providing for the circumstances which have arisen, I am unable to agree with the majority that the general discretion of the trial court is adequate authority to adopt a contrary procedure. That the result achieved by transporting the jury and other court personnel a substantial distance to a converted hospital auditorium is unusual and prejudical is recognized by the majority when it emphasizes the "safeguards" which were employed by the trial court. If this was just an ordinary humdrum occurrence no "safeguards" would have been necessary or even appropriate. All the "safeguards" do is emphasize the artificiality of the circumstances in which the victim's testimony is presented and clothe it with the appearance of special uniqueness or credibility. The subtle influence on a jury can only be speculated upon and consequently the procedure is lacking in fundamental fairness and ought not be approved. I believe that in the case at hand, hearing the victim's testimony outside the courtroom setting in a hospital, over the objection of the defendant, placed undue importance upon such testimony regardless of any admonitions given by the trial court to the contrary.

The view of a scene by the jurors has a purpose which cannot be replicated by mere descriptive testimony; however, no additional purpose is served in hearing testimony of a witness outside the courtroom. In fact, a significant amount of prejudice can be created in the minds of the jurors when a witness' testimony is heard outside the neutral atmosphere of the courtroom.

Therefore, it is my opinion that removing the trial to the hospital in order to hear the testimony of the victim was reversible error and this case should be remanded for a new trial.